1  BOTTINI & BOTTINI, INC.
   Francis A. Bottini, Jr. (SBN 175783)
2  Anne B. Beste (SBN 326881)
   Albert Y. Chang (SBN 296065)
3  Yury A. Kolesnikov (SBN 271173)
   7817 Ivanhoe Avenue, Suite 102
4  La Jolla, California 92037
   Telephone:    (858) 914-2001
5  Facsimile:    (858) 914-2002
   E-mail:       fbottini@bottinilaw.com
6                abeste@bottinilaw.com
7                achang@bottinilaw.com
8                ykolesnikov@bottinilaw.com

9  *Attorneys for Plaintiff and*
   *the Proposed Class*
10

11                    **UNITED STATES DISTRICT COURT**

          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12

| 13  LINDSAY MCCLURE, on behalf of herself and all others similarly situated, | Case No. |
|---|---|
| 14 | |
| | **CLASS ACTION COMPLAINT FOR:** |
| 15                                   Plaintiff, | |
| | 1. **Violations of Electronic Funds Transfer Act (15 U.S.C. § 1693 *et seq.*);** |
| 16         v. | |
| 17  BANK OF AMERICA, N.A., and DOES 1-20, inclusive, | 2. **Violations of California Unfair Competition Law;** |
| 18 | 3. **Violations of California Consumer Privacy Act;** |
| | Defendants. | 4. **Negligence;** |
| 19 | |
| 20 | 5. **Negligent Performance of Contract;** |
| 21 | 6. **Negligent Failure to Warn;** |
| 22 | 7. **Breach of Contract;** |
| 23 | 8. **Breach of Contract (Third-Party Beneficiaries);** |
| 24 | |
| 25 | 9. **Breach of Implied Contract; and** |
| 26 | 10. **Breach of the Implied Covenant of Good Faith and Fair Dealing.** |
| 27 | **DEMAND FOR JURY TRIAL** |
| 28 | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   JURISDICTION AND VENUE ............................................ 6

III.  PARTIES ........................................................................... 7

      A.   Plaintiff ................................................................... 7

      B.   Defendant ................................................................ 8

      C.   Doe Defendants ...................................................... 8

      D.   Aiding And Abetting, Concert Of Action ............... 8

IV.   FACTUAL ALLEGATIONS .................................................. 8

      A.   Bank of America's Contract with EDD .................... 8

      B.   Bank of America's Failure to Secure EDD Account Information .................................. 9

      C.   Bank of America's Use of Outdated, Vulnerable Magnetic Stripe Technology ........... 10

      D.   Bank of America's Promise of "Zero Liability" and "24/7" Customer Service ........... 13

      E.   Economic Devastation and Unemployment During the Covid-19 Pandemic ................ 14

      F.   Rampant Fraud on EDD Cards and Accounts ........... 16

      G.   Bank of America's Evasive and Ineffective Response ............................ 17

      H.   Plaintiff's Futile Experience of Trying to Reach Bank of America ............................. 19

V.    CLASS ACTION ALLEGATIONS .......................................... 21

VI.   CAUSES OF ACTION........................................................... 24

      PRAYER FOR RELIEF........................................................ 40

      JURY DEMAND .................................................................. 42

Plaintiff Lindsay McClure ("Ms. McClure" or "Plaintiff"), on behalf of herself and all others similarly situated, alleges the following against Defendant Bank of America, N.A. ("Bank of America" or "Defendant"), relating to the company's administration of California unemployment insurance benefits.  The allegations pertaining to Plaintiff are based on personal knowledge, and the allegations pertaining to all other matters are based on information and belief, including investigations by Plaintiff's counsel, including but not limited to news and media reports, SEC filings, analyst reports, governmental reports, and other sources.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a class action lawsuit on behalf of California residents whose unemployment benefits have been stolen, interfered with and diminished due to Defendant's wrongdoing.

2.    *California is one of only three U.S. states that does not offer a direct deposit option for unemployment benefits*.  Instead, it has awarded an exclusive contract to Defendant Bank of America to administer certain unemployment insurance and other benefits issued by the California Employment Development Department ("EDD").  For unemployed Californians struggling to survive, these EDD benefits provide critical resources to buy food and provide shelter.

3.    *Since March 2020, when the Covid-19 pandemic hit, California has paid out an unprecedented $113 billion in unemployment benefits*, as reflected in the following chart from EDD:

| Unemployment Claims Total Dashboard | | | | |
|---|---|---|---|---|
| | | **Current Week** | **Prior Weeks** | **Total** |
| | | January 9, 2021 | Week Ending March 7, 2020 – January 2, 2021 | Week Ending March 7, 2020 – January 9, 2021 |
| *Total Applications Submitted* (Approximate UI Online applications received from unemployed workers)[1] | **Regular UI** | 49,133 | 5,990,224 | 6,039,357 |
| | **PUA** | 21,323 | 4,518,796 | 4,540,119 |
| | **PEUC**[2] | 13,658 | 2,426,147 | 2,439,805 |

Class Action Complaint

| Unemployment Claims Total Dashboard | | | | |
|---|---|---|---|---|
| | | Current Week | Prior Weeks | Total |
| | FED-ED[3] | 15,715 | 558,966 | 574,681 |
| | Total | 99,829 | 13,494,133 | 13,593,962 |
| *Total Claims Processed* (Approximate applications processed by the EDD including reopened claims)[4] | Regular UI | 181,576 | 11,408,724 | 11,590,300 |
| | PUA | 33,625 | 4,101,925 | 4,135,550 |
| | PEUC[2] | 24,346 | 2,810,749 | 2,835,095 |
| | FED-ED[3] | 17,525 | 537,489 | 555,014 |
| | Total | 257,072 | 18,858,887 | 19,115,959 |
| *Total Benefits Paid* (Approximate combination of first benefit payments and continued claim biweekly payments)[5, 6] | Regular UI | $392 million | $59.6 billion | $60.0 billion |
| | PUA | $196 million | $43.0 billion | $43.2 billion |
| | PEUC[2] | $107 million | $8.4 billion | $8.5 billion |
| | FED-ED[3] | $176 million | $1.0 billion | $1.2 billion |
| | Total | $871 million | $112 billion | **$113 billion** |
| *Individuals Paid Benefits*[7, 8] (Expressed as four-week rolling totals to account for different biweekly payment cycles) | Regular UI | 2,795,000 | 2,820,000 | |
| | PUA | 1,383,000 | 1,526,000 | |
| | Total | 4,273,000[9] | 4,346,000[10] | |

4.    Whenever there is a large source of government money flowing, however, criminals will target the money and seek to steal it from its intended beneficiaries.

5.    Bank of America administers the EDD benefits by issuing pre-paid debit cards. Bank of America has known about prolific fraud by third party criminals, who take advantage of the lax security of these debit cards to steal EDD benefits, causing the debit cards to be frozen by Bank of America and thus for the funds to be unavailable to the unemployed persons entitled to the EDD benefits. These security lapses are Bank of America's fault, since it has continued to utilize the debit cards long after security experts have stated that the magnetic strips on the cards are not secure

///

1    and are subject to fraud and misuse.  Such security experts have for years advocated more advanced

2    and secure cards using chips, and such cards have in fact been widespread in Europe for many years.

3    Bank of America declined to use the chip cards, however, because they are more expensive and

4    would cut into its profits.

5        6.    Even worse, after the endemic fraud affecting its EDD debit cards continued to occur

6    on a daily basis and involve hundreds of millions of dollars, Bank of America in many instances

7    cast blame on the unemployed individuals to whom the cards were issued, instead of the criminals

8    perpetrating the fraud.

9        7.    As demonstrated herein, Defendant Bank of America has repeatedly failed to stop

10   criminals from breaching Bank of America's defective and outdated systems and controls, thus

11   allowing the criminals to steal millions of dollars of EDD from needy and unemployed individuals.

12       8.    While the unemployed persons who are one step away from being homeless are

13   denied the benefits awarded them by the State, Bank of America continues to collect its large profits

14   and revenues from its exclusive contract with California.

15       9.    On a daily basis, there are news reports of yet another EDD benefits recipient with a

16   Bank of America EDD prepaid debit card (an "EDD cardholder") who tried to use their card only

17   to discover that all the money in their Bank of America EDD account ("EDD account")—oftentimes,

18   the only money that they had to survive—was suddenly gone.

19       10.   It is frustrating and time-consuming for gainfully employed persons to attempt to

20   resolve disputes with banks.  Everyone has experienced the difficulty of attempting to reach a "real

21   person" on the phone.  But for unemployed persons who are attempting to keep their family fed, a

22   roof over their head, and at the same time look for a job (since unemployment benefits do not last

23   forever), the toll of waiting for hours on the phone to get through to a Bank of America

24   representative, and when finally successful to only be subject to more delays and the "run around,"

25   is demoralizing.  There have been many reported stories that Bank of America is doing exactly this

26   with respect to its "customer service" related to the EDD debit cards.  As noted by one news report:

27       Meet Benicia resident Rob Thurber.  "I went to pull out a thousand, and it said 'insufficient
         funds,'" said Thurber.

28

He says a thousand dollars was withdrawn from his EDD account and it wasn't him. He's got three daughters, his wife is disabled and he's been out of a job since the beginning of the pandemic.

Like everyone else, Thurber says filing a claim was a painful experience. "I waited on hold for seven hours," said Thurber. Two days later came the letter from Bank of America in the mail telling him his claim was closed, identical to dozens of others we've seen. Rob appealed. But a month-and-a-half later when we met up with him he was still waiting. "It's extremely frustrating. It really feels like they don't care," said Thurber.

We asked him if he feels a weight on his shoulder. His response: "Not just on my shoulders but you know kind of on my heart. It makes me sad because I am already struggling with the fact that I am not providing the way that I want to provide for my family," said Thurber.

"I think we're in the early stages of the uncovering of a very serious problem," said Ted Mermin. Mermin is Interim Director of the Berkeley Center for Consumer Law and Economic Justice at Berkeley Law and a former California Deputy Attorney General.[1]

11.     These failings are Bank of America's fault.  As one California lawmaker noted:

"For San Francisco Assemblymember David Chiu, a progressive Democrat who authored a 2019 public banking bill and has pushed to reduce state reliance on Wall Street, the confusion marks "another failure" by the state and its corporate vendors. *The employment agency hinted it was the bank's fault, insisting in an Oct. 29 statement that it "has no direct access to debit funds on any accounts" and that those impacted by card issues should contact Bank of America*."

*"They're playing the blame game. Someone needs to take responsibility for this," Chiu said. "I think we're going to have to revisit that contract if BofA can't provide the services it promised."*[2]

12.     Even Bank of America's own customer service representatives have voiced frustration at being unable to tell defrauded EDD cardholders that help is on the way.  As one customer service agent recently stated:

---

[1] *See* Kenny Choi, "Victims Of Bank Of America EDD Debit Card Fraud Tell Stories Of Fake Charges, Long Waits, Closed Claims," *CBS SF Bay Area*, Dec. 22, 2020, available at https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-frustration-loss/.

[2] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel California's Unemployment Meltdown," *CalMatters* (Nov. 20, 2020), *available at* https://calmatters.org/economy/2020/11/how-bank-of-america-helped-fuel-californias-unemployment-meltdown/.

*We're actually no longer allowed to tell them [defrauded EDD cardholders] a timeframe, because we have no clue . . . . Every day, I talk to 30 people with the same story. I just pray for them after my shift, honestly.*

**– Bank of America customer service representative**[3]

13.     According to its own EDD cardholder agreement, Bank of America has a **"Zero Liability" policy** for fraud.  But contrary to that policy, Bank of America has failed to assist or even communicate with many of the countless defrauded EDD cardholders.   Bank of America's ineffectual response to the rampant fraud has taken various forms, including not answering the customer service phone lines it advises EDD debit cardholders to call; opening claims and then closing them so soon thereafter that a full review could not have been done; crediting funds and then later debiting them without notice to the EDD cardholder; failing to extend provisional credit to EDD cardholders as required by law; and freezing EDD accounts unaffected by fraud.  Pursuant to its exclusive agreement with the State of California, Bank of America is solely responsible for the administration of EDD benefits, and the EDD has no ability to intervene in the company's procedures.

14.     The harm caused to unemployed individuals could easily have been prevented if Bank of America had simply adopted standard security procedures by securing the private financial information of EDD cardholders and accounts, and by issuing EDD cards with "EMV chips,"[4] rather than issuing cards with only outdated, fraud-prone "magnetic stripe" technology.

15.     Bank of America's gross negligence and/or conscious misconduct is evident when one considers its disparate treatment of the EDD debit cards compared to the other debit cards it issues to consumers.   Since 2014 Bank of America has used EMV chips in its normal consumer debit cards, stating that the technology is "an important tool in increasing card security."  In stark contrast, however, Bank of America has consciously refused to adopt and implement this EMV chip technology in its EDD debit cards.  Instead, and in order to save money and increase its profits,

---

[3] *Id.*

[4] "EMV" stands for Europay, Mastercard, and Visa, after the companies that created the technology.

Class Action Complaint

1   Bank of America chose to issue hundreds of thousands of EDD cards with magnetic stripe

2   technology, which when used at payment terminals openly transmits sensitive card and account

3   information and leaves cardholders vulnerable to fraud.

4        16.    As alleged more particularly herein, Bank of America  has engaged in substantial

5   wrongdoing by failing to protect the unemployment benefits it administers from fraud, by failing to

6   detect the fraud as it was happening and/or by failing to adequately respond and prevent such fraud

7   once detected, and by failing to resolve the problems, thereby causing substantial harm to Plaintiff

8   and the Class.

9   **II.**     **<u>JURISDICTION AND VENUE</u>**

10        17.    This Court has subject matter jurisdiction over this action pursuant to: (a) 28 U.S.C.

11   § 1332(d) because this is a class action in which the amount in controversy for the Class exceeds

12   $5,000,000 exclusive of interest and costs, there are more than 100 putative Class members as

13   defined below, and minimal diversity exists because the majority of putative Class members are

14   citizens of a state different than that of Bank of America; (b) 28 U.S.C. § 1332(a) because Plaintiff

15   and Class members are citizens of California, Bank of America is incorporated under the laws of

16   Delaware and has its principal place of business in North Carolina, and the amount in controversy

17   exceeds $75,000 exclusive of interests and costs; and (c) 28 U.S.C. § 1331 with respect to the cause

18   of action arising under federal Electronic Funds Transfer Act (15 U.S.C. § 1693, *et seq.*), and

19   28 U.S.C. § 1367 with respect to the causes of action arising under state law.

20        18.    This Court has personal jurisdiction over Bank of America because Bank of America

21   has sufficient minimum contacts with California, has purposely availed itself of the benefits and

22   protection of California law, and does a substantial amount of business in and with the State of

23   California (including contracting with the State of California to provide services to California

24   citizens), such that the Court's exercise of personal jurisdiction accords with due process.

25   / / /

26

27

28

- 6 -
Class Action Complaint

1    19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

2    portion of the acts or omissions giving rise to the claims in this Complaint occurred in this District,

3    and because Defendant is subject to the Court's personal jurisdiction with respect to this action.

4    **III.    PARTIES**

5        **A.    Plaintiff**

6        20.    Plaintiff Lindsay McClure is a person residing in California.    She is a Visual

7    Merchandiser at Nordstrom who found herself out of work during the Covid-19 pandemic.    She

8    applied for and received EDD unemployment benefits; soon thereafter, she received a Bank of

9    America EDD Visa debit card with a magnetic stripe (no EMV chip) to access her benefits.    Plaintiff

10    experienced fraudulent charges on or around December 1, 2020, after her card was skimmed at a

11    gas station.    She contacted Bank of America as soon as possible, and presented evidence of the

12    unauthorized transactions, which Bank of America acknowledged was indicative of fraud.    Bank of

13    America told her a fraud investigation would take place over the following 30-45 days.    Yet, she

14    received a letter shortly thereafter indicating her claim had been closed the day after she filed it.    She

15    followed up with Bank of America to inquire about her claim and was told that Bank of America

16    was investigating it.    When she asked how that was possible considering the letter closing it, the

17    Bank of America representative hung up on her. On or about December 17, 2020, without reaching

18    any resolution regarding her fraud claim, Bank of America froze her account without providing any

19    notice to her.    Plaintiff did not find out her account was closed until December 20, 2020, when she

20    tried to use her card at a drive-through and she could not access her funds. Ms. McClure then had

21    to call Bank of America herself and was told her account was closed. When she inquired about this,

22    Bank of America told her EDD had frozen her account due to fraud on her account. When Plaintiff

23    asked the Bank of America representative as she was in tears how they could do this, the

24    representative responded "hope you have a great Christmas and birthday" then proceeded to hang

25    up on her. When Ms. McClure contacted EDD, the agency said it had no notes about any such fraud

26    on her account. Bank of America has been either unwilling or unable to restore the missing funds to

27    her account, and to this date she still has not received any check to refund any existing funds still

28

1  available from her account or the stolen funds, or even any correspondence providing notice that
2  her account was closed.

3      **B.    Defendant**

4      21.    Defendant Bank of America, N.A., is one of the largest banking associations in the
5  United States.  It is incorporated in the state of Delaware and, as set forth below, does significant
6  business in California through, among other things, its exclusive contract with the State of California
7  to administer EDD benefits.

8      **C.    Doe Defendants**

9      22.    The true names and capacities of Defendants DOES 1–20, inclusive, are currently
10 unknown to Plaintiff.  Accordingly, Plaintiff sues each and every DOE Defendant by such fictitious
11 names.  Each DOE Defendant, individually and collectively, is responsible in some manner for the
12 unlawful acts alleged herein.  Plaintiff will seek leave of this Court to amend this Complaint to
13 reflect the true names and capacities of the DOE Defendants when their identities become known.

14     **D.    Aiding and Abetting, Concert of Action**

15     23.    Plaintiff alleges that at all times relevant to the events giving rise to this action, each
16 and every Defendant was acting as an agent or employee of each of the other Defendants.  Plaintiff
17 further alleges that at all times relevant to those events, each and every Defendant was acting within
18 the course and scope of that agency or employment at the direction of or with the full knowledge,
19 permission, or consent of each and every other Defendant.  In addition, each of the acts or omissions
20 of each and every Defendant was made known to, and ratified by, each of the other Defendants.

21 **IV.    FACTUAL ALLEGATIONS**

22     **A.    Bank of America's Contract with EDD**

23     24.    ***California is one of only three U.S. states that does not offer a direct deposit option***
24 ***for unemployment benefits***.  Instead, it has awarded an exclusive contract to Defendant Bank of
25 America to administer certain unemployment insurance and other benefits issued by the EDD.

26     25.    EDD issues a variety of benefits to California residents, including but not limited to
27 unemployment insurance benefits, disability insurance benefits, paid family leave benefits,

28

1  pandemic unemployment assistance benefits, and pandemic emergency unemployment

2  compensation benefits (collectively, "EDD benefits").

3       26.   In 2010, Defendant entered into an exclusive contract with California EDD to issue

4  debit cards through which individuals entitled to EDD benefits could access their funds, replacing

5  distribution of EDD benefits through paper checks.  EDD chose to contract with Bank of America,

6  in part, because it promised the EDD "best-in-class" fraud monitoring.[5]

7       27.   In July 2011, EDD began distributing benefits through the Bank of America cards as

8  the default option for EDD benefits recipients.

9       28.   In its successful 2015 proposal to EDD seeking to extend its exclusive contract, Bank

10  of America represented that, as part of its contract with EDD, it "fully intend[s] to apply the most

11  rigorous fraud detection procedures," including "employ[ing] the highest level of security and fraud

12  safeguards" based on "multiple layers of extensive security" and a "multi-faceted approach to

13  combat fraud."  The proposal specifically promises that Bank of America would provide "fraud

14  monitoring" for all EDD cards and accounts, and to employ technology that Bank of America stated

15  would provide "immediate response to emerging fraud trends" and allow fraudulent transactions to

16  be "declined in real time."

17       29.   Under the contract, Bank of America retains exclusive control over fund processing,

18  account management, and fraud detection for EDD cards and accounts.  Even if EDD were to

19  determine that an instance of fraud occurred, it has no authority to direct Bank of America to refund

20  the victim.

21       **B.   Bank of America's Failure to Secure EDD Account Information**

22       30.   Upon information and belief, Bank of America has failed to store or transfer EDD

23  cardholder and account information in a secure manner, resulting in a massive security breach that

24  has resulted in millions of dollars stolen from EDD through unauthorized transactions.

25

26

27  [5] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel California's
    Unemployment Meltdown," *CalMatters* (Nov. 20, 2020), *available at* https://calmatters.org
28  /economy/2020/11/how-bank-of-america-helped-fuel-californias-unemployment-meltdown/.

31.    For example, some EDD cardholders who have had money stolen from their EDD account through unauthorized transactions report **never having used their EDD card**. Upon information and belief, such unauthorized transactions could only have occurred if Bank of America failed to store or transfer EDD cardholder and account information in a secure manner.

32.    The large proportion of EDD cardholders whose accounts have been subject to fraudulent transactions also strongly indicates a wide-scale security breach of EDD cardholder and account information in Bank of America's possession, custody, and control, and which Bank of America had a duty to secure.

**C.    Bank of America's Use of Outdated, Vulnerable Magnetic Stripe Technology**

33.    To access their EDD benefits with a Bank of America card, a cardholder must send the information on their card through a processing network operated by Visa. The first step in that process occurs at the point of sale, where the cardholder either swipes or inserts their card into a card reader. The reader obtains data from the card and transmits that data to the financial services provider through a computer network, either at the time of the transaction or at a later time in a "batch" of other transactions. The cardholder's personal data is stored on the card.

34.    From the 1960s through the last decade, magnetic stripes were the standard for storing consumer information on debit and credit cards in the United States. A magnetic stripe contains static data about the cardholder including their name, account number, and the card's expiration date. This sensitive data is printed directly on the outside of the card and recorded on the magnetic stripe. When swiped through a reader, this data is collected and transmitted as part of the transaction process.

35.    But because the data on a magnetic stripe are static and easily readable, magnetic stripe cards are highly susceptible to fraud. One common method of stealing information from magnetic stripe cards is called "skimming," a process by which a wireless transmitter affixed to a card reader collects the information on the magnetic stripe and sends it to a nearby computer. The recipient can then use the information to easily clone the consumer's card, access the consumer's bank account, and perform online transactions.

Class Action Complaint

36.     Personal data on magnetic stripe cards can also be captured by hackers on a large scale.  For example, in 2013, hackers infiltrated the retailer Target's payment terminals and systematically captured the information of every swiped card for weeks, ultimately gathering card information for tens of millions of people.[6]  Card data collected in this manner can be sold on an underground market, where the stolen data can be used to make fraudulent purchases.

37.     Over the past decade, in an effort to stem the consumer fraud enabled by magnetic stripes, the financial services industry in the United States has adopted EMV chip technology as the industry standard.  While magnetic stripes are "static," with the same card-identifying information provided for every transaction, EMV chips are "dynamic," meaning the data they contain can be interacted with, altered, and updated.  An EMV chip creates a unique electronic signature for each transaction, making data from past EMV chip card purchases useless to would-be thieves, and thereby significantly reducing the risk of fraudulent, unauthorized transactions.

38.     In 2011, the same year it began issuing EDD debit cards, Bank of America announced it would offer EMV chip corporate credit cards to a subset of U.S. business customers who regularly traveled outside the United States.

39.     On September 30, 2014, Bank of America announced that it would include chip technology on **"all new and reissued"** consumer debit cards.  When announcing this shift, a Bank of America executive stated that "chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment cards." The executive added that the "new chip-enabled cards will improve security of customers' transactions."[7]

---

[6] Elise Hu, *Target Hack a Tipping Point in Moving Away from Magnetic Stripes*, NPR (Jan. 23, 2014), *available at* https://www.npr.org/sections/alltechconsidered/2014/01/23/264910138/target-hack-a-tipping-point-in-moving-away-from-magnetic-stripes.

[7] Bank of America Press Release, "Bank of America Begins Rollout of Chip Debit Cards" (Sept. 30, 2014), *available at* https://www.businesswire.com/news/home/20140930005292/en/Bank-of-America-Begins-Rollout-of-Chip-Debit-Cards (attached here as **Exhibit A**).

Class Action Complaint

1    40.    In 2015, card issuers and processors began a nationwide shift to EMV chip cards.

2   By 2017, an estimated 855 million EMV chip cards had been issued to U.S. consumers, and today

3   such cards are standard in the industry.

4    41.    Also in 2015, card-issuing banks and payment networks collectively stopped

5   absorbing liability for fraudulent transactions.  On October 1, 2015, merchants who did not have

6   certified EMV chip readers became liable for the fraudulent transactions if the consumer presented

7   an EMV chip card.  In essence, this meant liability for consumer card fraud would fall on either the

8   retailer or card issuer, whichever was the least compliant with EMV protocol.

9    42.    As stated on Bank of America's own website, EMV chip technology "has been

10  around for over 20 years and is the credit and debit card **security standard** in many countries around

11  the world.  When purchases are made using the chip feature at chip-enabled terminals, the

12  **transaction is more secure** because of the process used to determine if the card is authentic. This

13  makes the card **more difficult to counterfeit or copy**."  Bank of America also assures its account

14  holders on its website that "whether you use the magnetic stripe or the chip to make your purchase,

15  **you can have confidence in the protection and security features we provide for all credit and**

16  **debit accounts**."

17   43.    Despite the fact that Bank of America was well aware that EMV chip cards are

18  significantly more secure than magnetic stripe cards, the company chose to issue EDD debit cards

19  using old, vulnerable stripe technology to hundreds of thousands of the most financially vulnerable

20  Californians.  Bank of America did so notwithstanding its announcement that it would include chip

21  technology on all consumer debit cards.  Predictably, the unsecure cards led to rampant fraud,

22  resulting in the ongoing loss of millions of dollars in benefits that EDD has issued to assist

23  Californians who lost their jobs, including during the Covid-19 pandemic.

24  / / /

25  / / /

26  / / /

27  / / /

28

**D.      Bank of America's Promise of "Zero Liability" and "24/7" Customer Service**

44.      Bank of America represents to EDD benefits recipients that they will not be responsible for unauthorized transactions. On a webpage listing FAQs about its EDD cards, Bank of America responds to the question "Am I responsible for transactions that I did not make?" by explaining that its "**Zero Liability" policy** "protects you against fraudulent transactions."  In the "Quick Reference Guide" EDD cardholders receive with their card, Bank of America prominently states: "Zero liability: If your card is stolen, **Bank of America will reimburse you for any unauthorized card transactions** subject to certain terms and conditions."

45.      In its California Employment Development Department Debit Card Account Agreement ("Agreement") (attached here as **Exhibit B**), to which all EDD cardholders must agree, Bank of America sets forth these promises in greater detail.  The Agreement states: "Under the Bank of America 'zero liability' policy, you may incur **no liability for unauthorized use** of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time . . . ."  The Agreement advises the cardholder to "contact us at the number listed below AT ONCE if you believe your Card has been lost or stolen or if you believe that someone may use or has used your PIN assigned to your card without your permission.  Telephoning is the best way of keeping your possible losses down."  The Agreement requires that cardholders call or write to report an unauthorized transaction "no later than 60 days" after Bank of America sent the statement on which the error appeared.

46.      The Agreement promises that Bank of America "will determine whether an error occurred within 10 business days" after an unauthorized transaction is reported.  The Agreement reserves the right to "take up to 45 days to investigate" if the company "need[s] more time."  However, Bank of America promises, in that event, "**we will credit your Account within 10 business days** for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

- 13 -

47.    Bank of America also represents to EDD cardholders that the company's customer service is continuously available to assist with suspected fraud.  On Bank of America's EDD card FAQ webpage, in response to the question "What are the Bank of America EDD Debit Card Customer Service hours?" Bank of America claims that "[f]or your convenience," Bank of America's "dedicated **customer service representatives are available 24 hours [a] day, 7 days a week**" by phone.  The webpage further explains that customer service representatives can help with the following: "Resolve a question about your account statement," "Investigate transactions," "Process lost/stolen/damaged card reports," "Request an emergency cash transfer."  The reference guide which accompanies EDD debit cards likewise claims that "customer service is available 24/7." In the Agreement, Bank of America advises EDD cardholders that "Telephoning is the best way of keeping your possible losses down."

**E.    Economic Devastation and Unemployment During the Covid-19 Pandemic**

48.    In Spring of 2020, the Covid-19 pandemic devasted California's economy, and millions of workers lost their jobs due to business closures and mass layoffs.  The state's unemployment rate skyrocketed from 3.9% in January 2020 to 16.4% in April 2020, following the closure orders issued by Governor Gavin Newsom.  Industries such as hospitality, food service, retail trade, and educational services have been especially hard hit.

49.    As a result, millions of Californians turned to the EDD unemployment benefits programs administered by Bank of America to pay their bills.  Since March 2020, when the Covid-19 pandemic hit, through January 9, 2021, California has paid out an unprecedented $113 billion in unemployment benefits, as reflected in the following chart from EDD:

[The remainder of this page is intentionally left blank.]

- 14 -

Class Action Complaint

| Unemployment Claims Total Dashboard | | | | |
|---|---|---|---|---|
| | | **Current Week** | **Prior Weeks** | **Total** |
| | | January 9, 2021 | Week Ending March 7, 2020 – January 2, 2021 | Week Ending March 7, 2020 – January 9, 2021 |
| *Total Applications Submitted* (Approximate UI Online applications received from unemployed workers)[1] | **Regular UI** | 49,133 | 5,990,224 | 6,039,357 |
| | **PUA** | 21,323 | 4,518,796 | 4,540,119 |
| | **PEUC**[2] | 13,658 | 2,426,147 | 2,439,805 |
| | **FED-ED**[3] | 15,715 | 558,966 | 574,681 |
| | **Total** | 99,829 | 13,494,133 | 13,593,962 |
| *Total Claims Processed* (Approximate applications processed by the EDD including reopened claims)[4] | **Regular UI** | 181,576 | 11,408,724 | 11,590,300 |
| | **PUA** | 33,625 | 4,101,925 | 4,135,550 |
| | **PEUC**[2] | 24,346 | 2,810,749 | 2,835,095 |
| | **FED-ED**[3] | 17,525 | 537,489 | 555,014 |
| | **Total** | 257,072 | 18,858,887 | 19,115,959 |
| *Total Benefits Paid* (Approximate combination of first benefit payments and continued claim biweekly payments)[5,6] | **Regular UI** | $392 million | $59.6 billion | $60.0 billion |
| | **PUA** | $196 million | $43.0 billion | $43.2 billion |
| | **PEUC**[2] | $107 million | $8.4 billion | $8.5 billion |
| | **FED-ED**[3] | $176 million | $1.0 billion | $1.2 billion |
| | **Total** | $871 million | $112 billion | **$113 billion** |
| *Individuals Paid Benefits*[7,8] (Expressed as four-week rolling totals to account for different biweekly payment cycles) | **Regular UI** | 2,795,000 | 2,820,000 | |
| | **PUA** | 1,383,000 | 1,526,000 | |
| | **Total** | 4,273,000[9] | 4,346,000[10] | |

Class Action Complaint

**F.     Rampant Fraud on EDD Cards and Accounts and Plaintiff's Experience**

50.     Whenever there is a large source of government money flowing, criminals will target the money and seek to steal it from its intended beneficiaries.  In recent months, "**an epidemic of hack attacks**" on Bank of America EDD cards have been reported.[8]  Countless EDD cardholders have each reported hundreds or thousands of dollars stolen through unauthorized use of their Bank of America EDD debit cards.  These unauthorized transactions have taken various forms—including massive ATM withdrawals in distant states and countries,[9] thousand-dollar charges at luxury vendors, and repeated transactions with food delivery services.  Regardless of how or where the fraud has been carried out, Bank of America's prepaid EDD debit cards have proven highly susceptible to unauthorized use.

51.     After criminals exploit the security vulnerabilities of Bank of America's EDD cards and accounts and misappropriate account information, that information can be sold on the dark web, allowing the buyer to engage in unauthorized use of EDD accounts.[10]

52.     In Plaintiff's instance, she experienced fraud on her Bank of America EDD debit card on or around December 1, 2020, after her card was skimmed at a gas station.  She contacted Bank of America as soon as possible, and presented evidence of the unauthorized transactions, which Bank of America acknowledged was indicative of fraud.  Bank of America told her a fraud investigation would take place over the following 30-45 days.  Yet, she received a letter shortly thereafter indicating her claim had been closed the day after she filed it.  She followed up with Bank of America to inquire about her claim and was told that Bank of America was investigating it.  When

[8] Kenny Choi, "Victims of Bank of America EDD Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims," *KPIX–CBS SF Bay Area* (Dec. 22, 2020), *available at* https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-frustration-loss/.

[9] *See, e.g.*, CBSLA Staff, "Bank of America Freezes EDD Accounts of Nearly 350,000 Unemployed Californians for Suspected Fraud," *CBS Los Angeles* (Oct. 29, 2020), *available at* https://losangeles.cbslocal.com/2020/10/29/bank-of-america-freezes-edd-accounts-of-nearly-350000-unemployed-californians-for-suspected-fraud/.

[10] *See id.*

1  she asked how that was possible considering the letter closing it, the Bank of America representative

2  hung up on her.

3      53.    Several weeks later, without reaching any resolution regarding Plaintiff's fraud

4  claim, Bank of America froze her account.  When Plaintiff inquired about this, Bank of America

5  told her EDD had frozen her account due to fraud on her account. When Plaintiff contacted EDD,

6  the agency said it had no notes about any such fraud on her account.  Bank of America has been

7  either unwilling or unable to restore the missing funds to her account.

8      54.    Countless EDD cardholders have similarly reported not receiving any notification or

9  communication from Bank of America regarding fraudulent transactions in their accounts, and

10  instead discovered it themselves.  Bank of America's fraud monitoring and controls have proven—

11  in direct contradiction to its representations to the State—completely inadequate and ineffectual.

12      **G.    Bank of America's Evasive and Ineffective Response**

13      55.    As noted above, after becoming aware of fraudulent and unauthorized charges on her

14  debit card, Plaintiff has repeatedly sought assistance through Bank of America's fraud telephone

15  hotline to no avail.  Bank of America closed her complaint the day after it was filed, despite

16  promising to conduct an investigation over 3-45 days.  When Plaintiff attempted to follow up by

17  phone with Bank of America, the Bank of America representative hung up on her.

18      56.    To date, Plaintiff has not been reimbursed for the unauthorized transactions on her

19  EDD debit card, nor has Bank of America provisionally credited her account.

20      57.    The EDD has stated that the responsibility to prevent fraud and address claims of

21  unauthorized transactions lies entirely with Bank of America, clarifying on October 29, 2020 that

22  **EDD** "**has no direct access to debit funds on any accounts**" and that those impacted by card issues

23  should contact Bank of America.[11]  The agency has clarified that it has no means to intervene in

24  Bank of America's procedures.

25

26

27  [11] Matt Fountain, "Bank of America Froze SLO County Residents' Unemployment Benefits Because of Fraud," *San Luis Obispo Tribune* (Dec. 17, 2020), *available at* https://

28  www.sanluisobispo.com/news/local/article247729155.html.

58.     In October 2020, Bank of America made the unprecedented decision to freeze an estimated 350,000 EDD accounts, preventing those EDD cardholders from accessing their benefits. As of late November, less than eight percent of the frozen accounts had been reactivated.

59.     There have been numerous reports of individuals who have discovered unauthorized transactions on their cards and sought assistance from Bank of America to no avail.  Despite Bank of America's purported "Zero Liability" policy regarding fraudulent charges, Bank of America has been unhelpful and largely ineffective in its response.  EDD cardholders often spend hours on hold with customer service, despite Bank of America having represented to EDD cardholders in the account Agreement that "[t]elephoning is the best way of keeping your possible losses down." Defrauded EDD cardholders have been forced to wait weeks or longer without any access to their EDD benefits because Bank of America makes it unreasonably difficult to file their claims, which (even if filed) can languish before the claim's investigation ever occurs.

60.     Bank of America's inadequate response to EDD cardholders' issues with fraud on their EDD accounts makes eminently clear that it has failed to adequately staff its customer service and fraud investigation departments.

61.     Bank of America's ineffective response to the rampant fraud has taken various forms, including not answering the customer service phone lines it advises EDD debit cardholders to call; opening claims and then closing them so soon thereafter that a full review could not have been done; crediting funds and then later debiting them without notice to the EDD cardholder; failing to extend provisional credit to EDD cardholders; and freezing EDD cardholder accounts unaffected by fraud.[12]

62.     In short, as has been widely reported, many EDD cardholders have been forced to undertake an "unofficial full-time job trying to get the money back."[13]

---

[12] Kenny Choi, "Victims of Bank of America EDD Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims," *KPIX–CBS SF Bay Area* (Dec. 22, 2020), *available at* https:// sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-frustration-loss/.

[13] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel California's Unemployment Meltdown," *CalMatters* (Nov. 20, 2020), *available at* https://calmatters.org /economy/2020/11/how-bank-of-america-helped-fuel-californias-unemployment-meltdown/.

63.     As one defrauded EDD cardholder reported: "It's kind of like a nightmare . . . . Every day I'm wondering what's more important. **Do I get on the phone with the bank and try again so I have a place to sleep tomorrow, or do I just accept that I'm going to be on the street and focus on my job search?** Because you can't do both."[14]

64.     A Bank of America customer service worker, addressing the company's response to the influx of EDD debit card fraud, reported: "**We're actually no longer allowed to tell them a timeframe, because we have no clue** . . . . **Every day, I talk to 30 people with the same story.** I just pray for them after my shift, honestly."[15]

65.     Bank of America's disregard for EDD cardholders experiencing issues with fraud is particularly astonishing in light of the representations it made to the State in its proposal to administer EDD benefits, in which Bank of America stated, "we pride ourselves on providing stellar customer service to every caller. Long call hold waits and busy signals are not tolerated at Bank of America."

**H.    Plaintiff's Futile Experience of Trying to Reach Bank of America**

66.     Plaintiff's experience seeking reimbursement under Bank of America's "No Liability" policy demonstrates the futility of turning to Bank of America's customer service department for assistance as an EDD debit card holder.  After discovering the fraudulent charges on her debit card on December 1, 2020, Plaintiff contacted Bank of America as soon as possible, and presented evidence of the unauthorized transactions.

67.      Bank of America told Plaintiff a fraud investigation would take place over the following 30-45 days.  Yet, she received a letter shortly thereafter indicating her claim had been closed the day after she filed it.

68.     Plaintiff then followed up with Bank of America to inquire about her claim and was told that Bank of America was investigating it.  When she asked how that was possible considering the letter closing it, the Bank of America representative hung up on her.

---

[14] *Id.*

[15] *Id.*

69.     Several weeks later, without reaching any resolution regarding Plaintiff's fraud claim, Bank of America froze Plaintiff's account. When Plaintiff inquired about this, Bank of America told her EDD had frozen her account due to fraud on her account. When Plaintiff contacted EDD, the agency said it had no notes about any such fraud on her account.

70.     In short, Bank of America made no investigation of the claim and only took action to protect its own interests (by freezing the account).

71.     Plaintiff has followed the instructions in her account agreement, and made consistent, diligent efforts to recover the funds stolen from her account by multiple telephone calls and communications. In spite of this, Bank of America's customer service department offered Plaintiff no meaningful response or assistance, and indeed has stymied her efforts at nearly every turn.

72.     At no point have Plaintiff or members of the proposed class received communication—via mail, email, text, or otherwise—from Bank of America regarding the ongoing widespread fraud affecting EDD debit cards or how defrauded EDD recipients should proceed, even after the Company had frozen hundreds of thousands of EDD accounts in a desperate and heavy-handed effort to stem the effects of the fraud. The only option presented to individuals like Plaintiff has been to follow Bank of America's instructions to call the number on the debit card in reliance on its representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Plaintiff and members of the proposed class have learned, Bank of America's representations are false. Proceeding in accordance with Bank of America's policies and recommendations offers scant hope of recovering lost funds.

73.     Flooded by the complaints of defrauded constituents, in late November 2020, fifty-nine California lawmakers wrote a letter to Bank of America Chairman and CEO Brian Moynihan concerning the rampant fraud involving EDD cards and accounts, and the company's inadequate response. The letter notes, "The only recourse that EDD and our offices can currently provide constituents is to call Bank of America when these problems occur. However, **constituents report**

Class Action Complaint

1  **they are unable to get through to your call centers, or when they do, the issue is not resolved**."

2  The letter adds, "Many of our own staff have also tried to reach Bank of America to no avail."[16]

3        74.    In response to the letter, Bank of America offered—ostensibly as reassurance—that

4  fraud is "not something that happens for most [EDD debit] cards."  The company represented to the

5  lawmakers that "[w]hen a legitimate cardholder reports that he or she has had fraud on his or her

6  account (such as unauthorized use) and Bank of America's investigation confirms the report, Bank

7  of America covers the losses to the cardholder consistent with federal law and pursuant to our 'Zero

8  Liability' policy for unauthorized transactions."[17]

9        75.    California lawmakers reportedly plan to call Bank of America to Sacramento this

10 month for questioning about the widespread and ongoing fraud associated with its EDD debit cards.

11 **V.    CLASS ACTION ALLEGATIONS**

12        76.    Plaintiff brings this class action lawsuit individually and as a class action pursuant to

13 Federal Rule of Civil Procedure ("Rule") 23, seeking declaratory and equitable relief on behalf of all

14 persons in the State of California who are or have been entitled to unemployment benefits during the

15 limitations period ("Class Period") who are or will be threatened with injury arising from the

16 Defendants' wrongful actions, as more fully described herein (the "Class").

17        77.    Excluded from the above-proposed Class is Defendants' officers and directors and

18 any entity in which any Defendant has a controlling interest.

19        78.    Plaintiff reserves the right under Rule 23 to amend or modify the class descriptions

20 with greater specificity or further division into subclasses or limitation to particular issues, based on

21 information learned after the filing of this Complaint.

22        79.    This action has been brought and may properly be maintained as a class action

23 against Bank of America pursuant to the provisions of Rule 23.

24

25

26 [16] Philip Y. Ting, *et al.*, Letter to Brian Moynihan (Nov. 24, 2020), *available at* https://
   a19.asmdc.org/sites/a19.asmdc.org/files/pdf/b-letter-ceo-fnl.pdf (attached here as **Exhibit C**).

27 [17] Brian Putler (Dir. of Cal. Govt. Relations at Bank of America), Letter to Philip Y. Ting, *et al.*
28 (Dec. 7, 2020), *available at* https://sanfrancisco.cbslocal.com/wp-content/uploads/sites/15116056
   /2020/12/California-letter-from-BOFA.pdf.

a.   **Numerosity (Rule 23(a)(1))**: The members of the Class are so numerous that their individual joinder is impracticable. Hundreds of thousands of people, or more, received EDD debit cards with magnetic stripes issued by Bank of America during the Class Period, or otherwise would be members of the putative Class as defined above.  Insofar as class members may be identified through business records regularly maintained by Bank of America or Bank of America's employees, agents, principles, joint venturers, partners, affiliates, parents, or subsidiaries, and through the media, the number and identities of putative Class members can be ascertained.  Members of the putative Class can be notified of the pending action by e-mail, U.S. mail, and supplemented by published notice, if necessary.

b.   **Commonality (Rule 23(a)(2) and 23(b)(3))**: There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual class members. These common legal and factual issues include, but are not limited to:

   i.   Whether Defendants systematically engaged in conduct that constitutes *per se* violations of state and federal laws with respect to the distribution of EDD benefits through Bank of America debit cards, or with respect to any other performance under its contract with EDD;

   ii.   Whether Defendants breached the duty of care owed to persons who received Bank of America debit cards with magnetic strips for the purpose of accessing EDD unemployment or other benefits;

   iii.   Whether Defendants should be enjoined from freezing the EDD benefit accounts of EDD accountholders and/or the EDD debit cards of EDD cardholders;

- 22 -
Class Action Complaint

iv.    Whether Defendants' conduct breached any express or implied contract with EDD or any state agency, with the recipients of EDD debit cards, or with any member of the putative Class; and

v.    Whether Plaintiff and the Class have been harmed, and if so the proper measure of damages.

c.    **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the members of the putative Class. Plaintiff, like all other members of the putative Class, has sustained damages arising from Defendant's violations of the law, as alleged herein.  Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendant.

d.    **Adequacy of Representation (Rule 23(a)(4))**:  Plaintiff will fairly and adequately represent and protect the interests of the Class members, and  has retained counsel who are experienced in complex, class action litigation. There are no material conflicts between the claims of Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all putative Class members.

80.    This action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure for the following reasons:

a.    **Class Action Status (Rule 23(b)(1))**: Class action status is warranted here under Rule 23(b)(1)(A) because prosecution of separate actions by putative Class members would create a risk of establishing incompatible standards of conduct for Defendant.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by putative Class members would create a risk of adjudication with respect to individual members of the Class that, as a practical matter, would be dispositive of the

- 23 -

Class Action Complaint

interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

b. **Declaratory and Injunctive Relief (Rule 23(b)(2))**: Certification under Rule 23(b)(2) is warranted because Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

c. **Superiority (Rule 23(b)(3))**: Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

d. The Class is ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class member were infringed or violated in the same or similar fashion.

# VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violations of The Electronic Funds Transfer Act

(15 U.S.C. § 1693, *et seq.*; 12 C.F.R. § 1005.1 *et seq.*)

81.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

82.    Plaintiff brings this cause of action pursuant to the United States Electronic Funds Transfer Act ("EFTA") and 12 C.F.R. §§ 1005.1–1005.20 (Regulation E of the EFTA).

83.    Plaintiff and Class members provided notice to Bank of America within 60 days after Bank of America sent a period statement reflecting an unauthorized transaction (which is an "error" under Regulation E), thereby triggering the error resolution requirements of 12 C.F.R. § 1005.11.

Class Action Complaint

84.     Bank of America violated Regulation E, 12 C.F.R. § 1005.11, because it failed to provide provisional credit to Plaintiff's and Class members' accounts relating to error investigations that could not be resolved within 10 business days.

85.     In situations where Bank of America has violated Regulation E by failing to provisionally credit Plaintiff's and Class members' accounts, Bank of America has failed to conduct good faith investigations into the unauthorized transactions that Plaintiff and Class members have reported or attempted to report by, among other things, failing to provide Plaintiff and Class members reasonable access to Bank of America's customer service, and failing to provide Plaintiff and Class members meaningful assistance when they have been able to reach customer service. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

86.     In situations where Bank of America has violated Regulation E by failing to provisionally recredit Plaintiff's and Class members' accounts, Bank of America has not had a reasonable basis for believing that the account was not in error. Instead, Bank of America: (a) has made it unreasonably difficult for EDD cardholders to report suspected unauthorized transactions, and (b) has not used at all relevant times, and is not currently using, the resources and procedures necessary to resolve the levels of fraud that are occurring on Plaintiff's and Class members' accounts. This demonstrates that Bank of America has been unable or unwilling to form a reasonable basis for believing an account was not in error. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

87.     Bank of America knowingly and willfully concluded that Plaintiff's and Class members' accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to Bank of America at the time of its investigation. Plaintiff and Class members are therefore entitled to treble damages under 15 U.S.C. § 1693f(e).

88.     Bank of America violated Regulation E by failing to limit Plaintiff's and Class members' liability as required by 12 C.F.R. § 1005.6(b).

89.     Plaintiff provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in her EDD Bank of America account. Under

Class Action Complaint

12 C.F.R. § 1005.6(b)(1), Plaintiff's and similarly-situated Class members' liability is capped at $50 in these circumstances. Despite this cap on liability, Bank of America has subjected Plaintiff and similarly-situated Class members' to over $50 in liability.

90.    Under 12 C.F.R. § 1005.6(b)(2), $500 is the maximum liability when an accountholder does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction.

91.    Regarding any Class members who did not provide Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction, Bank of America was on constructive notice, under 12 C.F.R. § 1005.6(b)(5)(iii), of widespread unauthorized electronic funds transfers from EDD debit card accounts since the beginning of the Covid-19 pandemic. Since that time, countless unauthorized fund transfers have occurred and continue to occur from EDD accounts. The volume of calls from EDD cardholders to Bank of America's customer service to report unauthorized transactions has been, and continues to be, so great that EDD cardholders routinely wait on hold for multiple hours. The widespread fraud specifically targeting EDD cardholders has been widely reported in the media and has been the subject of significant attention from California legislators.

92.    In no event should any class member be liable for over $500 of damages under 12 C.F.R. § 1005.6. Bank of America has violated 12 C.F.R. § 1005.6 by imposing hundreds and thousands of dollars of liability on unemployed Californians.

93.    As a direct and proximate result of Bank of America violating Regulation E, Plaintiff and Class members have lost money.

94.    Plaintiff, on behalf of herself and the Class, seeks the following relief: (a) actual damages; (b) restitution of all EDD benefits funds improperly debited by Bank of America; (c) statutory damages; (d) treble damages pursuant to 15 U.S.C. § 1693f(e); (e) incidental and consequential damages suffered due to their inability to pay bills or otherwise use their unemployment funds; and (f) an injunction barring Bank of America from illegally debiting EDD benefits.

Class Action Complaint

1

**SECOND CAUSE OF ACTION**

2

**Violations of California's Unfair Competition Law**

3    95.    Plaintiff repeats and incorporates by reference each and every allegation set forth

4   above, as though fully set forth here.

5    96.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or

6   fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200, *et seq.*

7    97.    Bank of America's "unfair" acts and business practices include, among other things:

8   (a) failing to transfer or store EDD cardholder and account information in a secure manner; (b)

9   representing to the State of California that its EDD debit cards and card services would entail "best-

10  in-class" fraud monitoring, and then failing to equip its EDD debit cards with EMV microchip

11  technology despite knowing that such technology would be a necessary component of "best-in-

12  class" fraud monitoring; (c) failing to provide reasonable or adequate telephone assistance to

13  Plaintiff and other Class members despite representing to them that such assistance is available

14  "24/7" and despite representing to them that "Telephoning is the best way of keeping your possible

15  losses down"; (d) failing to investigate and resolve Plaintiff's and Class members' claims of

16  unauthorized transactions in a timely manner despite its "Zero Liability" policy for unauthorized

17  transactions; and (e) failing to extend provisional credit to Plaintiff and class Members in cases

18  where it is unable to timely investigate and resolve fraud claims.

19   98.    Bank of America's acts, omissions, and conduct are "unfair" under the UCL because

20  those acts, omissions, and conduct, as alleged herein, offend public policy and constitute immoral,

21  unethical, oppressive, and unscrupulous activities that caused substantial injury, including to

22  Plaintiff and Class members.  The harm caused by Bank of America's conduct outweighs any

23  potential benefits attributable to such conduct, and there were reasonably available alternatives to

24  further Defendant's legitimate business interests—namely issuing EDD debit cards with EMV

25  microchips and maintaining procedures and resources adequate to timely resolve reports of

26  fraudulent activity on prepaid EDD accounts—other than Bank of America's conduct described

27  herein.

28

99.     Bank of America has engaged in "unlawful" acts and business practices by violating multiple laws, including the California Consumer Privacy Act, as alleged herein; Regulation E of the federal Electronic Funds Transfer Act ("Regulation E"), which requires Bank of America to limit EDD cardholders' liability for unauthorized transactions and to extend provisional credit to EDD cardholders in cases where a fraud claim is not resolved within ten business days; and California statutory and common law, as alleged herein.

100.    As alleged herein, Bank of America expressly represented to Plaintiff and Class members, among other things, that EDD cardholders would have "Zero Liability" for unauthorized transactions, and that customer service representatives would be available 24 hours a day, 7 days a week, to address Plaintiff's and Class members' issues regarding unauthorized transactions.

101.    Bank of America has engaged in "fraudulent" acts and business practices because its false representations to EDD cardholders that they would have "Zero Liability" for unauthorized transactions and that customer service representatives would be available 24 hours a day, 7 days a week were likely to deceive, and did deceive, Plaintiff and Class members into using Bank of America's EDD debit card services to receive EDD benefits (instead of, for example, opting to receive EDD benefits via paper check) and into using Bank of America's EDD debit card services with substantially less vigilance than they otherwise would have, had they known about Defendant's fraudulent acts and business practices and false representations, as alleged herein.

102.    As a result of Bank of America's violations of the UCL, Plaintiff and Class members are entitled to injunctive relief (a) prohibiting Bank of America from continuing its unfair, unlawful, and deceptive business practices, and (b) requiring Bank of America to take reasonable measures to prevent future unauthorized use of EDD debit cards and accounts and to ensure timely and adequate processing of EDD cardholders' claims regarding unauthorized or fraudulent use of their EDD debit cards or accounts.

103.    As a result of Bank of America's violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, including but not limited to the funds lost to fraud that have not been reimbursed, fees paid to Bank of America, and lost interest that would

1  have accrued on funds during the period of time when the funds were unavailable due to Bank of

2  America's failure to timely and adequately investigate claims of unauthorized transactions and other

3  violations of the UCL.

**THIRD CAUSE OF ACTION**

**Violation of the California Consumer Privacy Act**

6  104.    Plaintiff repeats and incorporates by reference each and every allegation set forth

7  above, as though fully set forth here.

8  105.    The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et seq.*,

9  provides consumers with a private right of action against businesses when their personal information

10  is subject to unauthorized access, theft, or disclosure as a result of a business's breach of its duty to

11  take reasonable steps to protect that information.

12  106.    Plaintiff and Class members are "consumers" as defined in the CCPA.

13  107.    Defendant Bank of America is a "business" as that term is defined in the CCPA and

14  therefore is subject to liability thereunder.

15  108.    Bank of America directly or indirectly collected Plaintiff's and Class members'

16  personal information as defined in Cal. Civ. Code § 1798.81.5(d)(1)(A), including but not limited

17  to Plaintiff's and Class member's first names or first initials, last names and account numbers or

18  credit or debit card numbers, in combination with any required security codes, access codes, or

19  passwords that would permit access to an individual's financial accounts.

20  109.    Plaintiff's and Class members' individual and collective personal information was

21  collected, stored, and/or transmitted by Bank of America in a nonencrypted and nonredacted form,

22  or in some other form that permitted unauthorized individuals to access that information in violation

23  of the CCPA.

24  110.    As a business, Bank of America had a duty under the CCPA to implement and

25  maintain reasonable security procedures and practices appropriate to the nature of Plaintiff and Class

26  members' personal information.

27

28

Class Action Complaint

111.   Bank of America breached its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's and Class members' personal information by, among other things, issuing EDD debit cards to Plaintiff and Class members with magnetic stripes but without EMV chip technology.

112.   Upon information and belief, Bank of America further failed to implement and maintain reasonable security measures by transferring information regarding Plaintiff and Class members' EDD debit card to, and storing it on, unsecured or inadequately secured data storage devices, including at EDD.

113.   As a direct and proximate result of Bank of America's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff and Class members' personal information, Plaintiff and Class members suffered unauthorized access and exfiltration, theft, or disclosure of their nonencrypted and nonredacted personal information. Plaintiff and Class members never authorized such disclosure of their personal information.

114.   Bank of America knew or should have known that issuing EDD debit cards with magnetic stripes but without EMV chip technology was not a reasonable security procedure or practice appropriate to the nature of Plaintiff and Class members' personal information and that a data breach resulting in the unauthorized access and exfiltration, theft, or disclosure of Plaintiff and Class members' personal information was highly foreseeable.

115.   As a direct and proximate result of the unauthorized access and exfiltration, theft, or disclosure of their nonencrypted and nonredacted personal information, Plaintiff and Class members were injured and lost and/or continue to lose money or property, including but not limited to the monetary value of unauthorized transactions on the EDD debit cards issued by Defendant, the loss of Plaintiff and Class members' protected privacy interests in the confidentiality and privacy of their personal information, nominal damages, and additional losses as described above.

116.   Plaintiff and Class members seek relief under Cal. Civ. Code § 1798.150(a), including but not limited to recovery of actual damages, statutory damages, injunctive relief,

1  declaratory relief, its costs of suit, attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5 or other

2  appliable law, and any other relief the court deems proper.

3  **FOURTH CAUSE OF ACTION**

4  **Negligence**

5  117.    Plaintiff repeats and incorporates by reference each and every allegation set forth

6  above, as though fully set forth here.

7  118.    Bank of America owed a duty to Plaintiff and the other Class members to exercise

8  reasonable care to (a) safeguard their unemployment and other EDD benefits; (b) respond to the rise

9  in use of unemployment and other EDD benefits that occurred in 2020 (both in terms of the amount

10  of benefits paid out and the number of recipients) by issuing them EDD debit cards with EMV chips

11  (to all new and existing EDD cardholders); (c) ensure that its customer service staffing levels,

12  technology, and operations were capable of providing them with reasonably timely and effective

13  customer service, including for fraudulent or unauthorized transactions related to their EDD debit

14  cards or accounts; (d) provide them with reasonable and adequate notice that their EDD debit cards

15  and accounts were at risk of being subject to unauthorized use; (e) timely and adequately investigate

16  and resolve their claims regarding unauthorized or fraudulent transactions; and (f) extend to them

17  provisional credit in cases where Bank of America fails to timely resolve their fraud-related claims.

18  119.    Bank of America breached its duty to Plaintiff and Class members by, among other

19  things: (a) failing to transfer or store their EDD cardholder and account information in a secure

20  manner; (b) failing to issue them EDD debit cards with EMV chips, despite having for years been

21  well-aware of the risks associated with magnetic "stripe" technology; (c) failing to respond to the

22  dramatic increase in EDD benefits recipients and dollars (which foreseeably would make EDD debit

23  cards and accounts of greater interest to bad actors) by issuing EDD debit cards with EMV chips to

24  all new and existing EDD cardholders, and taking other reasonably prudent security measures to

25  prevent fraudulent and unauthorized transactions; (d) failing to ensure its customer service operation

26  was capable of providing reasonably timely and effective assistance to Plaintiff and Class members,

27  including when they are victims of fraudulent or unauthorized transactions; (e) failing to give

28

reasonable and adequate notice to Plaintiff and Class members that their EDD benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions; (f) failing to process EDD cardholders' claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner; and (g) failing to extend provisional credit to Plaintiff and Class members when Bank of America fails to resolve their claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner.

120. Bank of America's misconduct concerning its failure to safeguard EDD cardholders' funds is inconsistent with industry standards, which prescribe using EMV chip technology in debit cards.

121. Bank of America's misconduct concerning its failure to timely and adequately respond to Plaintiff's and Class members' claims of fraudulent and unauthorized transactions on their EDD debit cards or accounts is inconsistent with industry regulations, including Regulation E.

122. Bank of America's misconduct is inconsistent with its own policies and procedures for non-EDD debit card accounts, for which Bank of America consistently deploys EMV chip technology to prevent fraud.

123. The harm inflicted upon Plaintiff and other Class members was reasonably foreseeable to Bank of America because it was and is well aware of the security risks associated with magnetic stripe technology, and because it knew or should have known its customer service resources and/or procedures were insufficient to accommodate issues stemming from the significant increase in EDD benefits and EDD benefits recipients due to the sharp rise in unemployment in the State of California caused by or related to the Covid-19 pandemic, as well as the well-publicized sharp rise in financial fraud during the Covid-19 pandemic, both of which would foreseeably lead to an increased demand for customer service by Plaintiff and Class members for all purposes, including for the purpose of reporting and attempting to resolve claims of fraudulent or unauthorized transactions.

Class Action Complaint

124.    As a direct and proximate result of Bank of America's misconduct, Plaintiff and Class members have been deprived of their EDD benefits and have failed to receive accrued interest thereon.

## FIFTH CAUSE OF ACTION

### Negligent Performance of Contract

125.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

126.    Bank of America owed a duty to Plaintiff and the other Class members to exercise reasonable care in performing its contract with the State of California because Plaintiff and other Class members were and are intended beneficiaries of the contract.  To fulfill this duty, Bank of America was and is obligated to: (a) safeguard Plaintiff's and Class members' EDD benefits; (b) respond to the rise in demand for EDD benefits which occurred in 2020 by issuing chip cards; (c) ensure its customer service operation was capable of providing effective assistance to EDD cardholders who experience fraud on their debit card; (d) warn or notify Plaintiff and Class members if their EDD benefits were at risk of being subject to unauthorized use; (e) to timely and adequately investigate and resolve claims regarding unauthorized transactions; and (f) extend provisional credit in cases where fraud claims are not timely resolved.

127.    Bank of America breached its duty to Plaintiff and Class members by, among other things: (a) failing to transfer or store their EDD cardholder and account information in a secure manner; (b) failing to issue EDD debit cards with microchips, despite having for years been well-aware of the risks associated with magnetic "stripe" technology; (c) failing to respond to the rise in demand for EDD benefits by issuing chip cards; (d) failing to ensure its customer service operation was capable of providing effective assistance to EDD cardholders who experience fraud on their debit card; (e) failing to warn or notify EDD cardholders that their EDD benefits were and remain at risk of being subject to unauthorized use; (f) failing to timely or adequately process EDD cardholders' claims regarding unauthorized transactions; and (g) failing to extend provisional credit in cases where fraud claims are not timely resolved.

Class Action Complaint

128.    Bank of America's misconduct with regard to its failure to safeguard EDD cardholders' funds is inconsistent with industry standards, which prescribe using EMV chip technology in debit cards.

129.    Bank of America's misconduct with regard to its failure to timely and adequately respond to claims of fraud on EDD debit cards is inconsistent with industry regulations, including Regulation E.

130.    Bank of America's misconduct is inconsistent with its own policies and procedures for non-EDD debit card accounts, for which it implements EMV chip technology to prevent fraud.

131.    The harm inflicted upon Plaintiff and other Class members was reasonably foreseeable to Bank of America because Bank of America was well aware of the security risks associated with magnetic stripe technology, was aware that EDD cardholder and account information should be transferred and stored in a secure manner, and knew or should have known its customer service resources and/or procedures were insufficient to accommodate issues stemming from the increased distribution of EDD benefits which foreseeably entailed an increase in fraud claims.

132.    As a direct and proximate result of Bank of America's misconduct, Plaintiff and Class members have been deprived of their EDD benefits and have failed to receive the accrued interest thereon.

## SIXTH CAUSE OF ACTION

### Negligent Failure to Warn

133.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

134.    During all times relevant to this Complaint, Bank of America had actual or constructive knowledge of all relevant aspects of the vulnerabilities to fraud of using magnetic stripe technology in debit cards.

135.    During all times relevant to this Complaint, Bank of America had a duty to exercise reasonable and ordinary care and skill, and to behave in accordance with appliable standards of

Class Action Complaint

1  conduct, in adequately warning EDD cardholders about the fact that their EDD benefits would be at

2  a substantial risk of being fraudulently appropriated due to the magnetic stripe technology used in

3  its cards.

4    136.   Bank of America breached its duty by failing to adequately warn EDD cardholders

5  about the risks associated with magnetic stripe technology in debit cards.

6    137.   As a direct and proximate consequence of Bank of America's breach, Plaintiff and

7  Class member have been severely harmed.  Plaintiff and Class members have been deprived of the

8  EDD benefits which, in many cases, represented their only available funds.

9    138.   Bank of America's failure to warn was willful, malicious, oppressive, fraudulent,

10  and/or in reckless disregard of Plaintiff's and Class members' rights, thereby entitling Plaintiff and

11  Class members to punitive damages.

12    139.   Bank of America's ongoing failure to warn EDD cardholders about the risks

13  associated with EDD prepaid debit cards is irreparably harming Plaintiff and Class members, whose

14  EDD benefits remain vulnerable to unauthorized use.  Plaintiff and Class members seek injunctive

15  relief, and any and all available damages and/or restitution, in an amount to be proven at trial.

16                              **SEVENTH CAUSE OF ACTION**

17                                  **Breach of Contract**

18    140.   Plaintiff repeats and incorporates by reference each and every allegation set forth

19  above, as though fully set forth here.

20    141.   Plaintiff and Class members entered into a contract requiring Bank of America to

21  administer EDD benefits to them through prepaid debit cards.

22    142.   The contract provides in Section 9:

23    Federal law (described in the section below entitled "Regulation E Liability
       Disclosure; Your Liability in Case of Loss, Theft or Unauthorized Transactions") may
24     limit your liability for unauthorized transactions in some circumstances. Under the
       Bank of America "zero liability" policy, you may incur no liability for unauthorized
25     use of your Card up to the amount of the transaction, provided you notify us within a
       reasonable time of the loss or theft of your Card, Card number or PIN or its
26     unauthorized use, subject to the following terms and conditions . . . .

27    143.   The contract provides in Section 11:

28

                                    - 35 -

> We will determine whether an error occurred within 10 business days after we hear from you—and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation.

144.    Plaintiff and Class members did all, or substantially all, of the significant things that the contract required and fulfilled any conditions precedent to Bank of America's performance, including, among other things, contacting or attempting to contact Bank of America to reimburse fraudulently appropriated funds within the time specified in the account agreement.

145.    Bank of America failed to perform as promised in the contract by, among other things: (a) failing to timely investigate and resolve claims of unauthorized card use, as required by Section 11 of the account agreement; (b) failing to reimburse Plaintiff and Class members for unauthorized card use or provide provisional credit within ten business days, as required by Section 11 of the account agreement; and (c) failing to limit EDD cardholders' liability as required by Section 9 of the account agreement.

146.    Plaintiff and Class members were harmed by Bank of America's conduct and have suffered actual damages in an amount equal to the difference in the value of the banking services they provided valuable consideration for and the banking services they received.

### EIGHTH CAUSE OF ACTION

### Breach of Contract (Third-Party Beneficiaries)

147.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

148.    Bank of America and the State of California EDD entered into a contract requiring Bank of America to administer EDD benefits to Plaintiff and Class members through prepaid debit cards.

149.    A motivating purpose of the EDD in entering the contract was for EDD benefits recipients to benefit from the contract through secure administration of EDD benefits and competent

customer service relating to the administration of EDD benefits.  EDD cardholders are accordingly third-party beneficiaries of the contract between the EDD and Bank of America.

150.    Plaintiff, Class members, and the State of California EDD did all, or substantially all, of the significant things that the contract required and fulfilled any conditions precedent to Bank of America's performance.

151.    Bank of America failed to perform as promised in the contract by, among other things: (a) failing to take adequate steps to prevent fraud on EDD accounts, including but not limited to its failure to incorporate EMV chips into EDD debit cards; (b) failing to timely investigate and resolve claims of unauthorized card use, as required by Section 11 of the account agreement; and (c) failing to reimburse Plaintiff and Class members for unauthorized card use or provide provisional credit within ten business days, as required by Section 11 of the account agreement.

152.    Plaintiff and Class members were harmed by Bank of America's conduct and have suffered actual damages in an amount equal to the difference in the value of the banking services they provided valuable consideration for and the banking services they received.

## NINTH CAUSE OF ACTION

### Breach of Implied Contract

153.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

154.    Bank of America provided banking services to Plaintiff and members of the Class. In exchange Bank of America benefitted and continues to benefit from Plaintiff and the Class because it makes money through fees associated with EDD debit cards.

155.    Bank of America acknowledged these benefits and accepted or retained them.

156.    In using Bank of America's banking services, Plaintiff and Class members continually provide Bank of America with the ability and opportunity to make money through fees associated with EDD debit cards.

157.    By providing Bank of America that ability and opportunity, and upon Bank of America' acceptance of it, Plaintiff and Class members, on the one hand, and Bank of America, on

the other, entered into implied contracts separate and apart from Bank of America's terms of service, under which Bank of America agreed to and was obligated to take reasonable steps to ensure that Bank of America prepaid EDD debit card accounts were secure against unauthorized transactions and that any claims regarding unauthorized transactions were adequately investigated and resolved.

158.    All parties understood that such protections and customer service obligations were integral and essential to Bank of America's business.

159.    Under those implied contracts, Bank of America was obligated to provide Plaintiff and Class members with EDD prepaid debit card services that were suitable for their intended purpose of saving and accessing EDD benefits as needed, rather than such services that failed to take reasonable steps to safeguard their money, warn or notify them in the event that their EDD benefits were at risk of unauthorized use, or adequately investigate or resolve claims regarding unauthorized transactions.

160.    Without such implied contracts, Plaintiff and Class members would not have used Bank of America's prepaid debit card services and would not have conferred benefits on Bank of America.

161.    Plaintiff and Class members fully performed their obligations and fulfilled any relevant conditions under these implied contracts, including by, among other things, seeking assistance from Bank of America regarding suspected unauthorized transactions on EDD accounts.

162.    As described throughout, Bank of America did not take reasonable steps to protect Plaintiff's and Class members' deposited funds from unauthorized transactions or to adequately investigate or resolve claims regarding unauthorized transactions.  In fact, Bank of America willfully violated those interests by electing to issue EDD prepaid debit cards with outdated magnetic stripe technology, which it knows to be uniquely vulnerable to fraud, in lieu of EMV chip technology, which has been included in Bank of America consumer debit cards for over six years for the express purpose of protecting against fraud.

163.    Because Bank of America failed to take reasonable steps to protect EDD prepaid debit card holders' funds from being appropriated through unauthorized transactions and failed to

1  take reasonable steps to timely or adequately respond to claims regarding unauthorized transactions,

2  Bank of America breached its implied contracts with Plaintiff and Class members.

3      164.    Bank of America's failure to fulfill its obligations to take reasonable steps to protect

4  EDD prepaid debit card holders' funds from being appropriated through unauthorized transactions,

5  and its failure to take reasonable steps to timely or adequately respond to claims regarding

6  unauthorized transactions resulted in Plaintiff and Class members receiving banking services that

7  were of less value than they provided consideration for.

8      165.    Stated otherwise, because Plaintiff and Class members provided valuable

9  consideration for banking services in the form of fees associated with the cards, they did not receive

10  the full benefit of their bargain.

11      166.    As a result of Bank of America's conduct Plaintiff and members of the Class have

12  suffered actual damages in an amount equal to the difference in the value of the banking services

13  they provided valuable consideration for and the banking services they received.

14      167.    Accordingly, Plaintiff, on behalf of herself and Class members, seeks an order

15  declaring that Bank of America's conduct constitutes a breach of implied contract, and awarding

16  them damages in an amount to be determined at trial.

17                      **TENTH CAUSE OF ACTION**

18              **Breach of Implied Covenant of Good Faith and Fair Dealing**

19      168.    Plaintiff repeats and incorporates by reference each and every allegation set forth

20  above, as though fully set forth here.

21      169.    There is a covenant of good faith and fair dealing implied in every contract and every

22  implied contract.  This implied covenant requires each contracting party to refrain from doing

23  anything to injure the right of the other to receive the benefits of the agreement.  To fulfill its

24  covenant, a party must give at least as much consideration to the interests of the other party as it

25  gives to its own interests.

26      170.    Under the covenant of good faith and fair dealing implied in its account agreements

27  with Plaintiff and Class members, Bank of America was and is obligated to, at a minimum, (a)

28

1  safeguard Plaintiff's and Class members' EDD benefits; (b) respond to the rise in demand for EDD

2  benefits which occurred in 2020 by issuing chip cards; (c) ensure its customer service operation was

3  capable of providing effective assistance to EDD cardholders who experience fraud on their debit

4  card; (d) warn or notify Plaintiff and Class members if their EDD benefits were at risk of being

5  subject to unauthorized use; (e) to timely and adequately investigate and resolve claims regarding

6  unauthorized transactions; and (f) extend provisional credit in cases where fraud claims are not

7  timely resolved.

8      171.  Bank of America breached the implied covenant of good faith and fair dealing by,

9  among other things: (a) failing to issue EDD debit cards with microchips, despite having for years

10 been well-aware of the risks associated with magnetic "stripe" technology; (b) failing to respond to

11 the rise in demand for EDD benefits by issuing chip cards; (c) failing to ensure its customer service

12 operation was capable of providing effective assistance to EDD cardholders who experience fraud

13 on their debit card; (d) failing to warn or notify EDD cardholders that their EDD benefits were and

14 remain at risk of being subject to unauthorized use; (e) failing to timely or adequately process EDD

15 cardholders' claims regarding unauthorized transactions; and (f) failing to extend provisional credit

16 in cases where fraud claims are not timely resolved.

17     172.  As a direct and proximate result of Bank of America's breaches of the implied

18 covenant of good faith and fair dealing, Plaintiff and other Class members have suffered actual

19 losses and damages.

20                                **PRAYER FOR RELIEF**

21     WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following

22 relief:

23     A.  For an order certifying the Class as defined above, appointing Plaintiff as

24 representative for the Class, and appointing Plaintiff's counsel as counsel for the Class;

25     B.  For declaratory and injunctive relief prohibiting Defendant from engaging in the

26 misconduct described herein, including but not limited to ordering that Defendant take each of the

27 following corrective actions:

28

Class Action Complaint

| | | |
|---|---|---|
| | (1) | Refund all Class members for the value of unauthorized transactions from their EDD accounts; |
| | (2) | Issue EDD debit cards with EMV chips to all current and future EDD cardholders; |
| | (3) | Establish a customer service website, e-mail address, and telephone hotline that allow EDD cardholders to report unauthorized transactions and request reimbursement of the same in a reasonably easy and hassle-free manner; |
| | (4) | Respond to EDD cardholders' claims of unauthorized transactions and requests for reimbursement within a reasonable time; and |
| | (5) | Provide a reasonable opportunity for Class members to file claims regarding unauthorized transactions that otherwise would be deemed expired; |

C.    For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class members, including disgorgement, unjust enrichment, restitution, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff and Class members were deprived of funds in their EDD accounts due to unauthorized transactions;

D.    For an award of punitive damages pursuant to applicable law;

E.    For reasonable attorneys' fees and expenses as permitted by California Code of Civil Procedure § 1021.5, 15 U.S.C. § 1693m(a)(3), and any other applicable statute or law;

F.    For taxable costs;

G.    For pre- and post-judgment interest as allowed by law; and

H.    For any other relief the Court deems just.

/ / /

/ / /

/ / /

/ / /

1

## **JURY DEMAND**

2        Plaintiff requests a trial by jury of all claims that are so triable.

3    DATED:  January 25, 2021                 BOTTINI & BOTTINI, INC.
                                              Francis A. Bottini, Jr.
4                                             Anne B. Beste
                                              Albert Y. Chang
5                                             Yury A. Kolesnikov

6                                             _____
                                                    *s/ Francis A. Bottini, Jr.*
7                                                   Francis A. Bottini, Jr.

8                                             7817 Ivanhoe Avenue, Suite 102
                                              La Jolla, CA 92037
9                                             Telephone:    858/914-2001
                                              Facsimile:    858/914-2002
10                                            Email:        fbottini@bottinilaw.com
                                                            abeste@bottinilaw.com
11                                                          achang@bottinilaw.com
                                                            ykolesnikov@bottinilaw.com
12

13                                            *Attorneys for Plaintiff and the Class*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 42 -

Class Action Complaint

# EXHIBIT A





# Bank of America Begins Rollout of Chip Debit Cards

*Bank of America is the First Major U.S. Bank to Issue Chip on Consumer and Small Business Debit Cards*



Bank of America today announced that beginning this week, it will include chip technology on all new and reissued consumer and small business debit cards. Bank of America already includes chips on the majority of its credit card programs and is the first major U.S. bank to add the chip technology to debit cards. (Graphic: Business Wire)

September 30, 2014 11:10 AM Eastern Daylight Time

CHARLOTTE, N.C.--(BUSINESS WIRE)--Bank of America today announced that beginning this week it will include chip technology on all new and reissued consumer and small business debit cards. Bank of America already includes chips on the majority of its credit card programs and is the first major U.S. bank to add the chip technology to debit cards.

Cards with chip technology, which are also referred to as EMV (Europay, MasterCard, Visa) cards, are embedded with a microprocessor chip that encrypts transaction information. Each time the chip card is used, the transaction data changes, making it more difficult to copy or counterfeit the card.

Many countries outside the U.S. have already adopted EMV chip technology and it is expected to become the security standard for card payments in the U.S. as merchants begin adding chip-enabled terminals over the next year.

"Chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment cards," said Titi Cole, retail products and underwriting executive for Bank of America. "The new chip-enabled debit cards will improve security of customers' transactions when traveling abroad and at home as more U.S. merchants adopt chip technology."

merchant locations accepting chip transactions, customers will insert the card into the chip-enabled terminal at the register. After the PIN or signature. The cards include the traditional magnetic stripe so customers will be able to swipe their cards just as they do today if the merchant has not converted to the new technology. The new cards also work at ATMs just as they did before.

Beginning in October, debit cards issued to new customers will automatically include the chip technology. Existing customers will receive chip cards when their existing debit cards are replaced upon expiration or for any other reason.

Bank of America has been adding chips to its consumer, commercial and corporate credit cards in the U.S. since 2012.

"We will continue to be a leader in the protection of our customers' cards and in the prevention and detection of fraud," added Cole. "We are on track to convert our card portfolio to EMV and expect to have the majority converted by late next year."

Bank of America
Bank of America is one of the world's leading financial institutions, serving individual consumers, small businesses, middle-market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk management products and services. The company provides unmatched convenience in the United States, serving approximately 49 million consumer and small business relationships with approximately 5,000 retail banking offices and approximately 16,000 ATMs and award-winning online banking with 30 million active users and more than 15 million mobile users. Bank of America is among the world's leading wealth management companies and is a global leader in corporate and investment banking and trading across a broad range of asset classes, serving corporations, governments, institutions and individuals around the world. Bank of America offers industry-leading support to approximately 3 million small business owners through a suite of innovative, easy-to-use online products and services. The company serves clients through operations in more than 40 countries. Bank of America Corporation stock (NYSE: BAC) is listed on the New York Stock Exchange.

For more Bank of America news, visit the Bank of America newsroom.

**www.bankofamerica.com**

## Contacts
Reporters May Contact:
Betty Riess, Bank of America, 1.415.913.4416
betty.riess@bankofamerica.com

# EXHIBIT B

**BANK OF AMERICA**

# Terms and Conditions

## California Employment Development Department Debit Card Account Agreement

Effective Date March 1, 2018

By using or allowing another to use your California Employment Development Department Debit Card, you agree to be bound by the terms and conditions of this California Employment Development Department Debit Card Account Agreement ("this Agreement"). This Agreement discloses the terms and conditions of your California Employment Development Department Debit Card and you are not entitled to any rights or benefits given to deposit account customers or debit card holders at Bank of America, N.A. unless such rights or benefits are contained in this Agreement. **Please read this Agreement and the enclosed Fee Disclosure and Other Important Disclosures ("Fee Disclosure") carefully and keep it for future reference** In this Agreement: "Account" means the account accessed by your Card; "Card" or "Government Prepaid Debit Card" means the Government Prepaid Debit Card issued by us on behalf of California Employment Development Department ("EDD") to enable you to receive Unemployment or State Disability Insurance benefits to eligible recipients, "you" and "your" mean the recipient to whom we issue a Card or his or her legal representative; and "we", "us", and "our" mean Bank of America, N.A.

1  **General Information.**
**General Account Information.** Your Account is funded by the EDD with deductions for transactions and fees as more fully described in this Agreement. No interest is paid on the balance for any period of time.
**Individual Accounts Only.** Each Account is individually owned by the recipient who receives payments from the EDD. No joint ownership of an Account is permitted. You may have only one Card for each Account.
**Accounts are Not Transferable.** Your Account is not transferable to any other person. We reserve the right not to acknowledge or accept attempted pledges or assignments of, or purported security interests in, your Account.
**Business Days.** For purposes of this Agreement, our business days are Monday through Friday, excluding bank holidays.

2  **Deposits to Your Account and Funds Availability.**
**Funds Added to Your Account.** Deposits to your Account may only be made by the EDD. We will add funds to your Account only (a) in accordance with instructions from the EDD or (b) to remedy an error made by us or by someone who has accepted your Account. For information on the amounts and scheduled dates of additions to your Account, please contact the EDD. Once funds are properly deposited, the EDD has no rights to any funds in your Account, except as otherwise provided by law or the rules of the network used to make the deposit.
**When Funds are Available for Withdrawal.** Funds are available for your use on the day we have been instructed by the EDD to fund your Account. Once the funds are available, you may make the transactions

described below. Funds received by us may be delayed for a longer period if there is an emergency, such as failure of computer or communications. We will notify you if we delay your ability to make transactions as a result of an emergency and we will tell you when funds will be available.

**Overpayments and Reversals.** If funds to which you are not entitled are deposited to your Account by mistake or otherwise, we may deduct these funds from your Account. If there are not enough funds, we may overdraw your Account. We can do this without giving you any prior notice or demand. **"Freezing" Your Account.** If we suspect irregular, unauthorized, or unlawful activities may be involved with your Account, we may "freeze" (or place a hold on) the balance pending an investigation of such suspected activities. If we freeze your Account, we will give you a notice required by law.

3    **Transfer Types and Limitations.**

**Account Access.** You may use your Card to:

(1) Pay for purchases at places that have agreed to accept the Card as described below.

(2) Withdraw cash from your Account including by way of Emergency Cash Transfers as described below.

(3) Transfer funds from your Account to a checking or savings account owned by you in the United States whenever you request as described below.

(4) Pay bills directly [by telephone] from your Account in the amounts and on the days you request

Some of these services may not be available at all terminals.

**Purchases.** Your Card bears the Visa® symbol on the front face. Your Card may be used for purchases at merchants who accept Visa debit cards at a point-of-sale ("POS") terminal. Visa transactions may be made by presenting your Card and signing the receipt. You may also use your Card for purchases at POS terminals that require a Personal Identification Number ("PIN"). Some merchants will accept a transaction for an amount greater than the goods or services purchased and will refund the difference to you in cash.

**Use at Cirrus® or Visa Automated Teller Machines.** Your Card may be used for transactions at Cirrus or Visa Automated Teller Machines ("ATMs") to make cash withdrawals or balance inquiries requiring a PIN. See the Fee Disclosure for fees which may apply to ATM transactions. Most ATMs require that cash withdrawals be made in multiples of a dollar amount (e.g. $10 or $20). In addition, some ATM operators have maximum amounts that may be withdrawn at a machine in one transaction. Many merchants limit the amount of cash that may be obtained in connection with a purchase transaction.

**Obtaining Cash.** Offices of financial institutions that accept Visa cards, including Bank of America banking centers, will accept your Card for obtaining cash.

**Online Funds Transfer.** Your Card can be used to transfer funds online to a checking or savings account owned by you in the United States, subject to certain restrictions. This type of transfer may only be requested online via the Internet at www.bankofamerica.com/eddcard. Once funds are transferred, you will not be able to have the funds returned to your Account if the routing number or account number you provide for your checking or savings account is not correct.

**Emergency Cash Transfers.** You may obtain cash at a Western Union location in the United States ("Emergency Cash Transfer"). All Emergency Cash Transfer requests must be initiated through the Bank of America California Employment Development Department Debit Card Service Center (the "Service Center"). All requests for Emergency Cash Transfers are subject to the Emergency Cash Transfer Fees stated in the Fee Disclosure. All requests for Emergency Cash Transfers are subject to Western Union guidelines which

could vary by state and could include certain dollar limits, identification requirements and other restrictions. If you request an Emergency Cash Transfer, you agree that we have no liability for any losses or damages that you may suffer arising out of any action, non-action or delayed action on the part of Western Union or its agents or any other third party.

**Limitations on Frequency of Transfers.** You may withdraw up to $1,000 from any ATM each 24-hour period using the Card. For security reasons, there may be limits on the amount, number or type of transactions that you can make using your Card, and we may restrict access to your Card if we notice suspicious activity.

4    **Additional Account Agreements.**

**Account Alert Service.** You may sign up online for text or email alerts (the "Account Alert Service") to the mobile device or email address provided by you. Text or email alerts are dependent upon users providing a valid and current Internet email address or valid mobile device phone number. You can set up alert messaging options online at www.bankofamerica.com/eddcard. After signing up for the Account Alert Service, you must respond with an appropriate code to an alert sent to your mobile device (double opt-in) in order to begin receiving text message alerts. If you do not respond with the code provided in the alert, the Account Alert Service is not authorized. Each message references the last four digits of the Card for which the alert is sent. To change your alert messaging options or to discontinue the Service, go to www.bankofamerica.com/eddcard.

If you sign up for the Account Alert Service, you agree that we may send you text alerts through your wireless service provider. We do not charge for the Account Alert Service, but you are responsible for all charges and fees associated with usage of email or text messages imposed by your Internet, wireless, or cellular service provider(s).

Depending on the timing and the delivery mechanism, your balance may not reflect your most recent transactions. We assume no responsibility for transactions that may affect your balance after daily processing.

You understand and agree that the information provided to you by email or text alert is provided "as is" without warranty of any kind, either expressed or implied, and that we assume no responsibility for the timeliness, deletion, misdelivery, errors in the content of any email or text alerts or failure to store any user communications or personalization settings. In no event shall we be liable for any special, incidental, indirect, or consequential damages of any kind, or any damages whatsoever resulting from loss of use, data or profits, whether or not advised of the possibility of damage, and on any theory of liability, arising out of or in connection with the use or provision of this information.

The Account Alert Service can be terminated if we determine that your mobile device or email address does not support delivery of alerts, or if you have de-listed your mobile device or email address. In addition, we reserve the right at any time and from time-to-time to modify or discontinue, temporarily or permanently, the Account Alert Service (or any part thereof) with or without notice.

**Refunds and Merchant Disputes.** You do not receive cash refunds for returns of merchandise or services purchased using your Card. When a merchant gives you a refund, it is made on a credit voucher and will appear in your next monthly Account statement or in your Account history. You must settle any disputes you have about the goods or services directly with the merchant. We are not liable for any

misrepresentations that a merchant makes about the goods or services you purchase with your Card, or if a
merchant for any reason refuses to accept your Card or fails to abide by the applicable network rules
governing your Card.

**Legal Transactions.** You agree that you will only use your Card for transactions that are legal. For example,
Internet gambling transactions may be illegal in your state. Display of a Visa or other logo by an on-line
merchant does not mean that the transaction is legal where you conduct it. You agree that we may decline
transactions we believe may be illegal or in violation of the applicable network rules. You also agree that if
we do not decline the transaction, we may charge your Account and we are not liable to you if you engage
in an illegal transaction.

**ATM Safety.** Please refer to the safety tips for using your Card at ATMs found on the mailer that came with
your Card.

5   **Your Responsibility for Authorized Card Account Use and Negative Balances.**
**Use of Your Card and PIN.** Your Card and PIN are provided for your use and protection and you will:
(a) Not disclose your PIN or record it on your Card or otherwise make it available to anyone else;
(b) Use your Card, your PIN and any ATM only as instructed;
(c) Promptly notify us of any loss or theft of your Card or PIN; and
(d) Be liable for the authorized or permitted use of your Card and PIN.

**Authorized Use of Card.** If you authorize someone else to use your Card or PIN, you will be responsible for
any transactions initiated by such person(s) with your Card or PIN. Transactions will be considered
unauthorized only after you notify us that the person is no longer authorized to use your Card.

**Negative Balances. The amount available on your Card will be reduced by the amount of your
transactions plus applicable fees. There is no overdraft/credit feature on your Account.** However, if a
negative balance does occur in your Account, you agree (a) that we may take the amount of the negative
balance from subsequent additions to your Account or (b) to pay us on demand the amount of the negative
balance

6   **Bank Fees.**

**Fee Disclosure.** Bank fees associated with your Card are listed in the Fee Disclosure. These fees are
imposed by us and retained by us. When you use an ATM not owned by us, you may be charged a fee by the
ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not
complete a fund transfer).

**Payment of Fees by You.** You agree to pay all fees listed in the Fee Disclosure. Fees will be taken from the
balance of your Account as they occur. The EDD may not charge you any fees in connection with your Card
or your Account.

**Foreign Transactions/Fees.** If you use your Card to purchase goods or services in a foreign currency or in
US dollars with a foreign merchant or to obtain currency from an ATM or an office of a financial institution
in a foreign country (a "Foreign Transaction"), we will assess an International Transaction Fee. Please note
that Foreign Transactions include U.S. internet transactions made in the U.S. but with a foreign merchant. If
the Foreign Transaction is made in U.S. dollars, the International Transaction Fee will be the percentage of

that U.S. dollar amount as disclosed in the Fee Disclosure. If the Foreign Transaction is made in a foreign currency, Visa or Mastercard will convert the transaction into a U.S. dollar amount, and the International Transaction Fee will be the percentage of that converted U.S. dollar amount as disclosed in the Fee Disclosure. Any International Transaction Fee will be shown in the transaction section of your monthly Account statement or in your Account history. The currency conversion rate used by Visa will be either (1) a rate selected by Visa from a range of rates available in wholesale currency markets for the applicable central processing date, which rate may differ from the rate Visa receives, or (2) a government-mandated rate in effect for the central processing date. The currency conversion rate used by Mastercard will be either (1) a wholesale market rate selected by Mastercard, or (2) a government-mandated rate. The rate used by Visa or Mastercard on the processing date may differ from the rate on the date of your transaction.

7   **Right to Receive Documentation of Transactions**

**a. Terminal Receipts.** You usually can get a receipt at the time you make any transaction with your Card at an ATM, teller or POS; except that you may not get a receipt if the amount of the transaction is $15 or less. ATM receipts are not final because each transaction is subject to verification by us. If the receipt and our records conflict, our records will govern.

**b. Preauthorized Credits.** You can call us at 1.866.692.9374, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), to find out whether or not a direct deposit has been made.

**c. Delivery of Statements and Notices.** If you request to receive your monthly Account statement by mail, we will deliver it to the last address we have on our records for you. [See the Fee Disclosure for the fee for receiving monthly Account statements by mail.] You agree to notify us promptly, in writing, at the address listed in Section 11 below, of any change of address or you may change your address online at www.bankofamerica.com/eddcard. If you receive your monthly Account statement by mail, you may request that rather than receiving it by mail, you may review it electronically. If you wish to do so, you may make this request online at www.bankofamerica.com/eddcard or you may contact the Service Center at the address or phone number below.

**CARDHOLDERS WHO DO NOT RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL**

**Access to Your Account Information.** You may obtain information about the amount of money you have remaining in your Account by calling 1.866.692.9374, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.). That information is also available when you make a balance inquiry at an ATM. This information, along with a 12-month history of Account transactions, is also available online at www.bankofamerica.com/eddcard.

You also have the right to obtain a 24-month written history of Account transactions by calling 1.866.692.9374., 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), or writing to us at: Bank of America, P.O. Box 8488 , Gray, TN 37615-8488. You will not be charged a fee for this information unless you request it more than once per month.

**Prompt Review of Account Information.** You agree to promptly review your Account information and to notify the Service Center at the address or phone number above at once if any Account information shows transactions that you did not make or authorize. Section 11 below has more specific information about disputing transactions, fees, or errors.

**CARDHOLDERS WHO RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL Monthly Card Account Statements.** Upon your request, we will provide you with an Account statement monthly for every month in which your Account is open. The statement will include information about the transactions you made, deposits, fees and adjustments to your Account. A fee may apply to receive a monthly paper statement. For more information see the Fee Disclosure.

**Prompt Review of Statements.** You agree to promptly review your monthly Account statements and to notify the Service Center at the address or phone number above at once if any statement shows transactions that you did not make or authorize. Section 11 below has more specific information about disputing transactions, fees, or errors shown on your monthly Account statement.

8    **Claims by Third Parties Against Your Account.**
**Claims or Disputes by Third Parties Concerning Your Account.** If a third party makes a claim against funds in your Account, or if we have reason to believe there is or may be a dispute over matters such as the ownership of your Account or the authority to withdraw funds, we may, in our sole discretion and in accordance with applicable state or federal law (a) continue to rely on current enrollment forms or other Account documents, (b) honor the competing claim upon receipt of evidence we deem satisfactory to justify such action, (c) freeze all or part of the funds until the dispute is resolved to our satisfaction, or (d) pay the funds into an appropriate court of law for resolution.

**Liens and Attachments.** Following receipt by us of any notice of lien, process in attachment, garnishment or other proceeding relating to you or your Account, we are authorized, without notice to you, unless otherwise required by law, to withhold transfer of so much of the balance of your Account as may be the subject of such notice or process, and to pay such amount to the court or creditor, in accordance with applicable state or federal law without responsibility to you for such withholding or payment or for refusal to honor transfers made by you.

9    **Bank of America's "Zero Liability" Policy for Unauthorized Transactions.** Federal law (described in the section below entitled "Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions ") may limit your liability for unauthorized transactions on your Account, but you may still be liable in some circumstances. Under the Bank of America "zero liability" policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions:

**Excluded transactions.** Our zero liability policy does not apply to any unauthorized electronic fund transfer on an account which does not involve use of a Card or Card number.

**"Unauthorized" defined.** A transaction is considered "unauthorized" if it is initiated by someone other than you (the cardholder) without your actual or apparent authority, and you receive no benefit from the transaction. A transaction is not considered "unauthorized" if 1) you furnish your Card, Card number or other identifying information to another person and expressly or implicitly give that individual authority to perform one or more transactions, and the person then exceeds that authority, or 2) for any other reason we conclude that the facts and circumstances do not reasonably support a claim of unauthorized use.

**"Reasonable" time defined.** Reasonable time will be determined in our sole discretion based on the

circumstances but will not be less than the time frames specified under the Electronic Fund Transfer Act or Regulation E (see Section 10 below).

**Other considerations.** We may ask you for a written statement, affidavit or other information necessary to support your claim. If you do not provide the requested materials within the time requested or within a reasonable time if no date is stated, and we have no knowledge of the facts or other documentation to further investigate or confirm your claim, our zero liability policy may not apply.

**Limitation of our Liability.** Our liability under this policy is limited to reimbursing you for the amount of your loss up to the face amount of any unauthorized card transaction covered by this policy. We are not liable for any claims, losses or damages that arise out of your misuse of the Card. We are not liable for any claims of special, indirect or consequential damages.

**Your Rights under Regulation E.** If your claim does not meet the prescribed conditions for reimbursement under the above policy, you still retain any consumer rights you may have under Regulation E, as described in Sections 10 and 11 below, and we will automatically re-examine the claim in accordance with those rights.

10  **Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions. Contact Us Promptly.** Please contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your Account. If you tell us within two business days after you learn of the loss or theft, you can lose no more than $50 for an unauthorized transaction or a series of related unauthorized transfers should someone use your Card or PIN.

If you do NOT tell us within two business days after you learn of the loss or theft of your Card or PIN and we can prove we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.

Also, if your monthly Account statement or your Account history shows transfers that you did not make, including those made by your Card, Card number, PIN or other means, tell us at once. If you receive a monthly Account statement and you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had contacted us on time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

If you do not receive a monthly Account statement and do not tell us within 60 days after the earlier of the date you electronically access your Account if the error could be viewed in your electronic history or the date we sent the FIRST written history on which the error appeared (but in any event within 120 days after the transaction allegedly in error was credited or debited to your Account), you may not get back any money you lost after the applicable 60 or 120 day period if we can prove that we could have stopped someone from taking the money if you had contacted us on time. If a good reason (such as a long trip or hospital stay) keeps you from notifying us, we will extend the time periods.

If you believe your Card has been lost or stolen, call us at 1.866.692.9374, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.) or write to: Bank of America, P.O. Box 8488, Gray, TN 37615-8488.

NOTE: These liability rules are established by Regulation E which covers accounts that involve the use of a Card. Our zero liability policy, as described in Section 9 above, regarding unauthorized transactions may give you more protection, provided you report the transactions promptly. You should also note that when you give someone your Card or PIN, you are authorizing that person to use your Card and you are responsible for all transactions that person performs with your Card or PIN. These transactions are authorized transactions. Transactions are considered unauthorized only after you notify us that the person is no longer authorized. Remember, do not write your PIN on your Card or carry your PIN with you. This reduces the possibility of someone using your Card without your permission if it is lost or stolen.

11 **Error Resolution.**

In Case of Errors or Questions About Your Transactions:

Telephone us at: 1.866.692.9374

1.866.656.5913 TTY

423.262.1650 (Collect, when calling outside the U.S.)

Or write to:

Bank of America

P.O. Box 8488

Gray, TN 37615-8488


**CARDHOLDERS WHO RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL**

Call or write as soon as you can if you think your monthly Account statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared. You will need to tell us:

(a) Your name and Card Account number.
(b) Why you believe there is an error, and the dollar amount involved.
(c) Approximately when the error took place.

If you tell us orally, we may require that you send your complaint or question in writing within 10 business days.

**CARDHOLDERS WHO DO NOT RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL**

Call or write as soon as you can if you think an error has occurred in your Account. We must allow you to report an error until 60 days after the earlier of the date you electronically access your Account, if the error could be viewed in your electronic history, or the date we sent the FIRST written history on which the error appeared; but in any event you must report the error no more than 120 days after the transaction allegedly in error was credited or debited to your Account. You may request a written history of your transactions at any time by calling or writing to us at the numbers and address listed above. You will need to tell us:

(1) Your name and Card Account number.
(2) Why you believe there is an error, and the dollar amount involved.
(3) Approximately when the error took place.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

**WHEN YOU WILL HEAR FROM US**

We will determine whether an error occurred within 10 business days after we hear from you—and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your Account.

For errors involving new accounts, POS, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your Account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation. If you need more information about our error-resolution procedures, call or write to us using the contact information listed above.

12 **Our liability for failure to complete transactions.**
If we do not complete a transfer to or from your Account on time or in the correct amount according to this Agreement, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

- If, through no fault of ours, you do not have enough available money in your Account to make the transaction;

- If the ATM where you are making the transaction does not have enough cash;

- If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transaction;

- If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transaction, despite reasonable precautions that we have taken;

- If your Card or PIN has been reported to be, or suspected of being, lost or stolen, and we have taken action to prevent transactions with the Card or PIN;

- If your Account is subject to some legal process, right of setoff or encumbrance restricting the transaction, or if the funds in your Account are not immediately available for completing a transaction.

13 **Preauthorized Transactions.**
**Right to Stop Payment and Procedure for Doing So.** If you have told us in advance to make regular payments out of your Account, you can stop any of these payments. Here's how:

Call us at 1.866.692.9374, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), or write us at: Bank of America, P.O. Box 8488, Gray, TN 37615-8488, in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

**Notice of Varying Amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be.

Our Liability for Failure to Stop Payment of Preauthorized Transfers. If you order us to stop one of these payments three business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

14 **Privacy**

As part of establishing your Account, you will receive with your Card a copy of the Prepaid Card Privacy Notice which generally addresses our policy for handling and disclosing information for your Card. You may view our Prepaid Card Privacy Notice at www.bankofamerica.com/prepaidprivacy. With respect to any information we collect from you as a result of your Card, we will only share such information related to your Account, from time to time, subject to any applicable financial privacy laws or other laws or regulations, (a) where it is necessary for completing transactions; (b) in response to any subpoena, summons, court or administrative order, or other legal process which we believe requires our compliance; (c) in connection with collection of indebtedness or to report losses incurred by us; (d) in compliance with any agreement between us and a professional, regulatory or disciplinary body; (e) in connection with potential sales of businesses; (f) to service providers who help us meet your needs by assisting us in providing the services under this Agreement; or (g) If you give us your written permission.

15 **Recording and Monitoring Telephone Calls.**

We may record or monitor telephone calls between you and us. We need not remind you of our recording or monitoring before each call unless required to do so by law.

16 **Amendment/Termination.**

**Amendments.** We may, at any time, change the terms and conditions in this Agreement, including the amount of any fee. We may add new terms and conditions and we may delete or amend existing terms and conditions. We generally send you at least 21 days' advance notice of an adverse change, including increased fees to you, increased liability for you, fewer types of available electronic fund transfers, or stricter limitations on the frequency or dollar amount of transfers. If a change is not adverse to you, however, we may make the change at any time without advance notice. If you do not agree with the change, you may close your Account. However, if you continue to use your Account or keep it open, you accept and agree to the change.

**Our Closure or Suspension of Your Account.** We may close or suspend your Account at any time. Your Card remains our property. We may cancel your right to use your Card at any time. Once your Account has been closed, you agree to discontinue using your Card. If we close your Account, we may, at our option, apply the remaining balance to a new account for your benefit. If you have not spent the remaining balance prior to Account closure, you may contact the Service Center to request a check for the remaining balance, less the Paper Check Fee.

**Your Closure of Your Account.** If, at the time you close your Account, all transactions have cleared and there is no remaining balance, your Account will be closed to further use. If there is a remaining balance, you may use your Card to reduce the balance to zero before closing your Account. Alternatively, you can contact the Service Center to request a check for the remaining balance of your Account, less the Paper Check Fee, or request an Emergency Cash Transfer. You understand that you are responsible for negative balances that occur after your notice of closure to the same extent as provided in this Agreement for an open Account. You agree to destroy your Card after your Account is closed.

17  **Unclaimed Property.**

Any remaining unclaimed balance will be reported and remitted as unclaimed property to the appropriate state as required by state law after a period of time defined by that state's law. After we turn the funds over to the state, we have no further liability to you for the funds and you must apply to the appropriate state agency to reclaim your funds.

18  **Governing Law/Severability.**

This Agreement will be governed by the laws and regulations of the United States and, to the extent not so covered, by the laws and regulations of the State of California. A determination that any part of this Agreement is invalid or unenforceable will not affect the remainder of this Agreement.

19  English Document Controlling.

As a service that we may provide to you at your request, we may communicate certain information to you in Spanish. Any legal clarifications which may need to be made will be based on the use and application of the English versions, including but not limited to this Agreement and the Fee Disclosure.

20  Fee Disclosure and Other Important Disclosures.

A copy of our Fee Disclosure and Other Important Disclosures is included with, and incorporated in, this Agreement.

# EXHIBIT C



STATE CAPITOL
P.O. BOX 942849
SACRAMENTO, CA 94249-0115

November 24, 2020

Mr. Brian Moynihan
Chairman of the Board and Chief Executive Officer
Bank of America Corporation
100 North Tryon Street
Charlotte, NC 28255-0001

Dear Mr. Moynihan:

Every legislative office in our state has experienced an unprecedented number of constituents
contacting them requesting assistance to resolve issues with the California Employment
Development Department (EDD), as well as with their Bank of America debit cards. We
commend our California EDD and the Bank of America employees for their hard work over the
last eight months, creating better systems to get funds to constituents as quickly as possible.

Today, we write with a new and significant concern about frozen Bank of America debit cards.

Most beneficiaries receive their weekly Unemployment Insurance (UI) or Pandemic
Unemployment Assistance (PUA) funds on a debit card issued and managed by Bank of America
under contract with CA EDD. Over the last six weeks, reportedly due to significant fraud,
hundreds of thousands of UI, PUA and State Disability Insurance (SDI) recipients have had funds
taken from their cards or their cards frozen, leaving them unable to access their benefits.

EDD reports to legislative staff that Bank of America has a proprietary formula to detect fraud and
has taken it upon themselves to freeze cards and take money from recipients. The only recourse
that EDD and our offices can currently provide constituents is to call Bank of America when these
problems occur. However, constituents report they are unable to get through to your call centers,
or when they do, the issue is not resolved. Many of our own staff have also tried to reach Bank of
America to no avail. It is simply unacceptable that Californians entitled to benefits are suddenly
not able to obtain them due to a Bank of America determination that is impossible to appeal.

The press reports at least 350,000 Californians are currently unable to access UI, PUA and SDI
benefits owed to them. That said, EDD is unsure of the exact number, as they state they only
receive data from Bank of America after cards are frozen. EDD also informs us that less than 8%
of debit card cases have been resolved.

Mr. Brian Moynihan
November 24, 2020
Page 2

With this in mind, we are writing to ask that you provide us specific answers to the following questions:

- Why is Bank of America taking funds and freezing cards? What criteria is Bank of America using?
- When CA EDD clears fraud or verifies identity on their end, why is Bank of America not immediately unfreezing the cards that CA EDD asks Bank of America to unfreeze?
- Our offices have many cases in which Bank of America states that EDD froze the card. Our staff call EDD, who claims the problem is entirely on Bank of America's end. What is the solution to this problem?
- What needs to happen for a constituent to have their card reactivated and funds restored?
- Will you significantly increase staff tasked with reactivating cards and restoring funds to resolve these issues by December 1, 2020?
- Has Bank of America had to pay any penalties due to fraud or failure to respond to alleged fraud within a certain timeframe related to California UI or PUA claims? If so, to whom and for what?
- Can Bank of America proactively contact consumers when their card is deactivated, or funds will be taken so they are not forced to discover this when they use the card?
- What can Bank of America do to stop the automatic freezing of multiple cards at one address without first checking with EDD to see if they may be legitimate?
- Who pays for fraudulent charges when it is not the consumer's fault? Bank of America or another entity?
- Are there time limits under federal law by when Bank of America must unfreeze a debit card in a suspected fraud case? If so, what are they? Are there exceptions?
- Will you please provide an explanation to Governor Gavin Newsom and the CA Legislature as to how to unfreeze valid cards in a timely manner and prevent this problem from happening again by December 1, 2020?

We appreciate in advance your timely attention to addressing these problems and responding to this letter.

Sincerely,

cc: Governor Gavin Newsom

Philip Y. Ting
Assemblymember, 19th District

Anthony Rendon
Speaker of the Assembly, 63rd District

Mr. Brian Moynihan
November 24, 2020
Page 3

Brian Dahle
Senator, 1st District

Mike McGuire
Senator, 2nd District

Bill Dodd
Senator, 3rd District

Jim Nielsen
Senator, 4th District

Andreas Borgeas
Senator, 8th District

Bob Wieckowski
Senator, 10th District

Scott D. Wiener
Senator, 11th District

Anna M. Caballero
Senator, 12th District

Jerry

Mr. Brian Moynihan
November 24, 2020
Page 4



Scott Wilk
Senator, 21st District

Mike Morrell
Senator, 23rd District



Maria Elena Durazo
Senator, 24th District



Henry I. Stern
Senator, 27th District

Thomas J. Umberg
Senator, 34th District



Patricia C. Bates
Senator, 36th District



Megan Dahle
Assemblymember, 1st District



Jim Wood
Assemblymember, 2nd District

James Gallagher
Assemblymember, 3rd District

Cecilia M. Aguiar-Curry
Assemblymember, 4th District

Mr. Brian Moynihan
November 24, 2020
Page 5



Marc Levine
Assemblymember, 10th District

Susan Talamantes Eggman
Assemblymember, 13th District

Timothy S. Grayson
Assemblymember, 14th District

Buffy Wicks
Assemblymember, 15th District

Rebecca Bauer-Kahan
Assemblymember, 16th District

David Chiu
Assemblymember, 17th District

Bill Quirk
Assemblymember, 20th District

Kevin Mullin
Assemblymember, 22nd District

Marc Berman
Assemblymember, 24th District

Kansen Chu
Assemblymember, 25th District

Mr. Brian Moynihan
November 24, 2020
Page 6

Devon J. Mathis
Assemblymember, 26th District



Ash Kalra
Assemblymember, 27th District

Mark Stone
Assemblymember, 29th District



Robert Rivas
Assemblymember, 30th District

Joaquin Arambula
Assemblymember, 31st District



Rudy Salas, Jr.
Assemblymember, 32nd District

Vince Fong
Assemblymember, 34th District



Tom Lackey
Assemblymember, 36th District

Monique Limón
Assemblymember, 37th District

Luz M. Rivas
Assemblymember, 39th District

Mr. Brian Moynihan
November 24, 2020
Page 7



Chris R. Holden
Assemblymember, 41st District



Laura Friedman
Assemblymember, 43rd District

Jesse Gabriel
Assemblymember, 45th District



Ed Chau
Assemblymember, 49th District

Wendy Carrillo
Assemblymember, 51st District



Eduardo Garcia
Assemblymember, 56th District

Ian C. Calderon
Assemblymember, 57th District

Cristina Garcia
Assemblymember, 58th District

Jose Medina
Assemblymember, 61st District

Mike A. Gipson
Assemblymember, 64th District

Mr. Brian Moynihan
November 24, 2020
Page 8

Sharon Quirk-Silva
Assemblymember, 65th District

Steven S. Choi
Assemblymember, 68th District

Randy Voepel
Assemblymember, 71st District

Cottie Petrie-Norris
Assemblymember, 74th District

Brian Maienschein
Assemblymember, 77th District

Todd Gloria
Assemblymember, 78th District

Shirley N. Weber
Assemblymember, 79th District